Volume 1 of 2

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MICHAEL JAMES BERGER, a single
man also known as Magic Mike,
            *Plaintiff-Appellee,*

v.

CITY OF SEATTLE; VIRGINIA
ANDERSON, Director of Seattle
Center; MICHAEL ANDERSON,
Emergency Service Manager for
Seattle Center; TEN UNKNOWN
EMPLOYEES/OFFICERS, of the Seattle
Center and the City of Seattle, all
in both their individual and
official capacities,
            *Defendants-Appellants.*

No. 05-35752

D.C. No.
CV-03-03238-JLR

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
September 23, 2008—San Francisco, California

Filed June 24, 2009

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Stephen Reinhardt, Michael Daly Hawkins,
Kim McLane Wardlaw, Ronald M. Gould, Richard A. Paez,
Marsha S. Berzon, Richard C. Tallman, Milan D. Smith, Jr.
and N. Randy Smith, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Chief Judge Kozinski;
Dissent by Judge Gould;
Partial Concurrence and Partial Dissent by
Judge N.R. Smith

**COUNSEL**

Elena Luisa Garella, Law Office of Elena Luisa Garella, Seattle, Washington; Robert Corn-Revere, Davis Wright Tremaine LLP, Washington, DC, for the plaintiff-appellee.

Gary Keese and Carlton W. Seu, Seattle City Attorney's Office, Seattle, Washington, for the defendants-appellants.

Sarah A. Dunne, American Civil Liberties Union, Seattle, Washington on behalf of amicus curiae American Civil Liberties Union.

**OPINION**

BERZON, Circuit Judge:

In 2002, the City of Seattle promulgated a set of rules governing the conduct of visitors to one of its major attractions, an 80-acre public park and entertainment complex known as

the Seattle Center. The new rules regulated for the first time the behavior of the Center's street performers. We consider today the constitutional validity of some of those rules.

Among other provisions, the new rules required street performers at the Seattle Center to obtain permits before performing; set out specified locations for street performances and established a first-come, first-served rule for using the locations; allowed only passive solicitation of funds by street performers; and prohibited any communication, by street performers or anyone else, within thirty feet of visitors to the Seattle Center who are waiting in line, attending an event, or sitting in a spot available for eating or drinking. Following the rules' publication, "Magic Mike" Berger, a balloon artist and frequent Seattle Center performer, filed a lawsuit challenging the new regulations just outlined on the grounds that they violate his First Amendment rights. The district court agreed with Berger and so invalidated all five of the challenged rules. The City now asks us to reverse, asserting that all the regulations impose valid "time, place, or manner" restrictions on the actions of street performers and other park-goers.

For the reasons discussed below, we decline to do so. The government bears the burden of justifying the regulation of expressive activity in a public forum such as the Seattle Center. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). The City of Seattle has failed to meet this burden with respect to any of the rules challenged by Berger. We therefore affirm the district court's grant of summary judgment to Berger, except that we remand for further factual development concerning the validity of the locational regulation.

## I.   Background

The Seattle Center is a central venue for Seattle's civic, cultural, and social life. The Center's roughly 80-acre expanse of public space attracts over ten million visitors annually. It

is home to Seattle's iconic Space Needle, and to museums, sports arenas, theaters, and a performance hall. The Center's grounds also include twenty-three acres of outdoor public park space.

In 2002, the Seattle Center's Director issued a revised set of regulations concerning the use of the Center, known as the Seattle Center Campus Rules ("Rules").[1] Among other matters, the Rules govern the use of the Center's outdoor spaces. Five of the Rules are relevant here: Rule F.1, which requires "street performers" to obtain a permit before performing at the Center and to wear a badge displaying that permit while performing; Rule F.2, which sets forth the terms and conditions for acquiring a "Street Performer Permit"; Rule F.3.a, which bars street performers from "actively solicit[ing] donations"; Rule F.5, which limits street performances to sixteen designated locations; and Rule G.4, which prohibits all Seattle Center visitors, other than Center employees and licensed concessionaires, from engaging in "speech activities" within thirty feet of a "captive audience." Rule C.5 defines a "captive audience" as "any person or group of persons: 1) waiting in line to obtain tickets or food or other goods or services, or to attend any Seattle Center event; 2) attending or being in an audience at any Seattle Center event; or 3) seated in any seating location where foods or beverages are consumed."

About a year after the Rules were promulgated, Michael Berger, a balloon artist and Seattle street performer, filed the complaint that gives rise to this appeal. In his complaint, Berger alleged that the five rules just summarized violate the First Amendment both on their face and as applied to him. In 2005, the district court granted Berger summary judgment as to his facial challenges. Shortly thereafter, Berger and the City settled his as-applied challenges. The City now timely appeals the summary judgment.

---

[1]The City has delegated its rulemaking authority over the Center to the Center's Director. *See* Wash. Mun. Code § 17.04.040.

## II. General Principles

We review a district court's legal determinations, including constitutional rulings, *de novo. See Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006). A district court's determinations on mixed questions of law and fact that implicate constitutional rights are also reviewed *de novo. See Cogswell v. City of Seattle*, 347 F.3d 809, 813 (9th Cir. 2003). Where, as here, the key "issues aris[e] under the First Amendment," we also conduct an independent review of the facts. *See Rosenbaum v. City & County of S.F.*, 484 F.3d 1142, 1152 (9th Cir. 2007).

We begin our analysis with one bedrock principle: The protections afforded by the First Amendment[2] are nowhere stronger than in streets and parks, both categorized for First Amendment purposes as traditional public fora. *See Perry Educ. Ass'n*, 460 U.S. at 45; *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1021 (9th Cir. 2008). In such fora, the government's right "to limit expressive activity [is] sharply circumscribed." *Perry Educ. Ass'n*, 460 U.S. at 45. Among traditional public fora, public parks such as the Seattle Center are especially important locales for communication among the citizenry, as they " 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Grossman v. City of Portland*, 33 F.3d 1200, 1204-05 (9th Cir. 1994) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).[3]

---

[2]The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of people peaceably to assemble. . . ." U.S. Const. amend. I; *see also Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938) (holding that the First Amendment's prohibitions also apply to state and local government rule-makers).

[3]Although the City argued at the district court that the Seattle Center was only a limited public forum and so subject to more stringent government regulation than a traditional public forum, *see Perry*, 460 U.S. at 45-46, it does not on appeal challenge the district court's determination that the "Seattle Center is a traditional public forum." The record supports this characterization, as Judge Smith ably demonstrates in his separate opinion.

Despite the broad First Amendment protection accorded expressive activity in public parks, "certain restrictions on speech in the public parks are valid. Specifically, a municipality may issue reasonable regulations governing the time, place or manner of speech." *Grossman*, 33 F.3d at 1205; *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). To pass constitutional muster, a time, place, or manner restriction must meet three criteria: (1) it must be content-neutral; (2) it must be "narrowly tailored to serve a significant governmental interest"; and (3) it must "leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark*, 468 U.S. at 293).

With these overarching principles in mind, we turn to an evaluation of each of the challenged rules.

## III. Rules F.1 & F.2: The Permit & Badge Requirements

### A. *Overview*

Rule F.1 requires all "street performers" to obtain a permit from the Director prior to performing on the Center's grounds. A "street performer" is "a member of the general public who engages in any performing art or the playing of any musical instrument, singing or vocalizing, with or without musical accompaniment, and whose performance is not an official part of an event sponsored by the Seattle Center or by a Seattle Center licensee."[4] Rule C.15. Notably, a "street performer" need not be seeking payment from his audience to be

---

[4]Music and performance art are forms of expressive activity protected by the First Amendment. *See Ward*, 491 U.S. at 790; *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65-66 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee.") (collecting cases).

covered by the permit and other requirements, nor need he be a repeat performer at the Seattle Center. Permits are issued "upon [the] Director's satisfaction that the information set forth in the [performer's] application is true, the applicant has executed a statement stating that he or she will comply with applicable law and all provisions of the Seattle Center rules, and has paid the applicable application fee." Rule F.1. The permits are presumptively valid for one year, Rule F.2, and allow permit-holders to perform "at designated locations on the Seattle Center campus." Rule C.16. Rule F.1 also mandates that "[p]ermits, when issued, shall be evidenced by a badge that shall be worn or displayed by the performer in plain view at all times during a performance."

The permitting requirement outlined in Rule F.1 is noteworthy for what it does not cover. It places no limitation, for example, on the number of street performer permits that the Director may issue in a given year. Nor does the required permit assign particular performers to specific venues or performance times. Instead, "[p]erformance locations are available on a first come first served basis" and "may not be 'saved' or 'reserved.' " Rule F.4.

Rule F.2 sets forth the "terms and conditions" governing the permits, including the grounds for their revocation. Although the City represents that the Rules provide the Director with no discretion to deny a permit application, the language of Rule F.2 suggests otherwise. According to the Rule, the Director may deny or condition a permit "as appropriate to protect the health, safety and welfare of the public and/or the campus; to protect property; to avoid or limit interference with other uses or users of the campus; [and] to minimize disturbance of the surrounding neighborhood." The Director may also require the performer to obtain insurance, supply a security deposit, and/or post a bond. A permit may be revoked by the Director "for convenience," so long as the Director provides the performer with notice.

### B.    *Constitutionality of Rules F.1 and F.2*

### 1.    **Single-Speaker Registration Requirements**

**[1]** A permitting requirement is a prior restraint on speech and therefore bears a " 'heavy presumption' " against its constitutionality. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). As the Court explained in *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002),

> [i]t is offensive — not only to the values protected by the First Amendment, but to the very notion of a free society — that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so.

*Id.* at 165-66; *see also id.* at 166 ("Even if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the applicant, a law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition.").

The presumptive invalidity and offensiveness of advance notice and permitting requirements stem from the significant burden that they place on free speech. "Both the procedural hurdle of filling out and submitting a written application, and the temporal hurdle of waiting for the permit to be granted may discourage potential speakers." *Grossman*, 33 F.3d at 1206. Registration requirements also dissuade potential speakers by eliminating the possibility of anonymous speech. *See Watchtower Bible*, 536 U.S. at 166; *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-42 (1995) ("[A speaker's] decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about

social ostracism, or merely by a desire to preserve as much of one's privacy as possible."). And, critically, advance notification requirements eliminate "spontaneous speech." *See Watchtower Bible*, 536 U.S. at 167; *see also Grossman*, 33 F.3d at 1206 (noting that "because of the delay caused by complying with the permitting procedures, '[i]mmediate speech can no longer respond to immediate issues.' ") (alteration in original) (quoting *NAACP. v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984)); *see also Rosen v. Port of Portland*, 641 F.2d 1243, 1249 (9th Cir. 1981).

As a result of the significant burden that registration requirements place on speakers, the Supreme Court has consistently struck down permitting systems that apply to individual speakers — as opposed to large groups — in the one context in which they have been put in place with some regularity: solicitation of private homes. *See Watchtower Bible*, 536 U.S. at 166-67; *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 638-39 (1980) (striking down a solicitation permit requirement); *Cantwell v. State of Conn.*, 310 U.S. 296, 301, 306-07 (1940) (striking down a license requirement as applied to Jehovah's Witnesses "going singly from house to house" for the purpose of religious solicitation); *Schneider v. State of N.J.*, 308 U.S. 147, 163-64 (1939) (striking down a permitting scheme covering all forms of solicitation). The Court has recognized that the government interests asserted in these door-to-door solicitation cases — the prevention of crime and fraud, and the protection of residential privacy — are weighty. *See, e.g.*, *Watchtower Bible*, 536 U.S. at 164-65. Nonetheless, it has repeatedly concluded that single-speaker permitting requirements are not a constitutionally valid means of advancing those interests because, typically, (1) they sweep too broadly, *see, e.g.*, *Vill. of Schaumburg*, 444 U.S. at 636-37 (invalidating registration requirement because, among other things, it applied to groups engaged in legitimate activities as well as those who were not); *Watchtower Bible*, 536 U.S. at 165-66 (same), (2) they only marginally advance the government's asserted interests,

*see, e.g.*, *Watchtower Bible*, 536 U.S. at 168-69 (noting that a permitting requirement is "unlikely . . . [to] preclude criminals from knocking on doors and engaging in conversations [with homeowners]," and that "[t]he annoyance caused by an uninvited knock on the front door is the same whether or not the visitor is armed with a permit"), and (3) the government's interests can be achieved by less intrusive means, *see id.* at 168-69 (noting that a homeowner's privacy interests can be adequately protected by "No Solicitation" signs); *see also Vill. of Schaumburg*, 444 U.S. at 637 (asserting that "[f]raudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly." (citing *Schneider*, 308 U.S. at 164)).[5]

---

[5]Chief Judge Kozinski argues that this case and *Watchtower Bible* "have about as much in common as bananas and boomerangs." Kozinski Dissent at 7814. The comparison is colorful, but the Chief Judge's attempt to brush aside *Watchtower Bible* does not work, for a myriad of reasons.

First, and contrary to the Chief Judge's contention, performance art, like door-to-door canvassing, has historically served an important role in the dissemination of ideas. *See* Gould Dissent at 7819 ("Speech in the form of music, drama, or performance has played a vital role in our society and deserves First Amendment protection. Some of our culture's most valued written works originated as spoken performances."). Second, the Seattle Center's permitting requirement, like the permitting requirement in Watchtower Bible, significantly inhibits spontaneous speech. This critical point, which the Chief Judge ignores, was an important aspect of the Supreme Court's holding in *Watchtower Bible*. Third, there is no reason to believe that street performers are less interested in maintaining their anonymity from the government than door-to-door canvassers or other purveyors of potentially unpopular ideas. *See Watchtower Bible*, 536 U.S. at 166 ("The fact that circulators revealed their physical identities did not foreclose our consideration of the circulators' interest in maintaining their anonymity [in *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999)]. In the Village, strangers to the resident certainly maintain their anonymity, and the ordinance may preclude such persons from canvassing for unpopular causes."). Fourth, as noted, the ordinance applies whether or not the street performer solicits funds, and the definition of "street performer" includes individuals who do not solicit funds. Finally, like the permit regulation in *Watchtower Bible*, the permitting requirement in this case applies to individuals who communicate their message to groups as small as two or three others. In short, the principles set forth by the Supreme Court in *Watchtower Bible* apply with as much force in this context as they did in the context of door-to-door canvassers.

**[2]** Although the Supreme Court has not addressed the validity of single-speaker permitting requirements for speech in a public forum, it stands to reason that such requirements would be at least as constitutionally suspect when applied to speech in a public park, where a speaker's First Amendment protections reach their zenith, than when applied to speech on a citizen's doorstep, where substantial privacy interests exist. *See Frisby v. Schultz*, 487 U.S. 474, 483-84 (1988). It is therefore not surprising that we and almost every other circuit to have considered the issue have refused to uphold registration requirements that apply to individual speakers or small groups in a public forum. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1039 (9th Cir. 2006) ("As the cautionary language in our earlier opinions indicates, the significant governmental interest justifying the unusual step of requiring citizens to inform the government in advance of expressive activity has always been understood to arise only when large groups of people travel together on streets and sidewalks."); *see also Grossman*, 33 F.3d at 1206 (holding that the possibility that the ordinance at issue could reach "the actions of single protestors" rendered it unconstitutional); *Rosen*, 641 F.2d at 1247-48 (invalidating a one-day advance registration requirement because it applied to individuals and therefore "regulate[d] far more than mass conduct that necessarily interferes with the use of public facilities"); *Cox v. City of Charleston*, 416 F.3d 281, 285 (4th Cir. 2005) ("[U]nflinching application" of a permitting requirement "to groups as small as two or three renders it constitutionally infirm."); *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) ("[A]pplying the permit requirement to groups as small as ten persons compounds our conclusion that the parade permit ordinance is not narrowly tailored [to advance the government's interest in protecting the safety and convenience of users of public sidewalks and streets.]"); *American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) (striking down a permit requirement as "hopelessly overbroad" on the ground that the requirement

could conceivably apply to groups as small as "two or more persons").[6]

[3] In this case, the Center's permitting requirement applies to individual speakers who wish to express themselves in a public forum.[7] The requirement is not limited to only those performers who seek to attract (or who do, in fact, attract) a crowd of a sufficiently large size.[8] As noted, neither we, the

---

[6]The Second Circuit recently upheld a single-speaker permitting requirement in *Hobbs v. County of Westchester*, 397 F.3d 133, 150 (2d Cir. 2005). But the regulation in *Hobbs*, as interpreted by the Second Circuit, required individuals who planned to perform on public property to obtain a permit only if they planned to use "props and/or equipment," so the permit requirement was triggered by conduct, not speech. *Id.* at 151. Also, the court did not directly consider the constitutionality of the permitting requirement. Rather, it evaluated the constitutionality of an Executive Order which prohibited the issuance of permits to individuals who had been previously convicted of a sex offense against a minor, and whose planned performance was designed to attract children. *Id.* at 152. In that narrow context, the court upheld the prohibition as a valid time, place, and manner restriction.

[7]Although street performers do, of course, hope to draw crowds, this goal is of little moment to our analysis. The individual protestors in *Rosen* and *Grossman* also undoubtedly hoped to attract crowds of people eager to learn their views. But we have emphasized that advance registration permits are only appropriate for larger crowds than any street performer at the Seattle Center is likely to draw at one time. *See Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1033 (9th Cir. 2008) ("Although it is a close question, we hold that a group of seventy-five people using a public open space in Long Beach is large enough to warrant an advance notice and permitting requirement."). As we note later, *see infra* pp. 7764-65, an otherwise valid, general permit requirement applicable to large groups could be applied to street performers, but only if the crowd attracted is in fact large enough to reach the minimum crowd size covered by that valid requirement.

[8]In his dissent, Chief Judge Kozinski concedes that "individual-to-individual and small group-to-small group interactions generally do not pose the sort of problems that time, place and manner rules are designed to deal with." Kozinski Dissent at 7814. The Seattle Center's permitting requirement implicates just such interactions. Under the current rules, Michael Berger must obtain a permit whether he wishes to perform his

Supreme Court, nor most other circuit courts have ever upheld such a requirement. In addition, the interests the City asserts here — reducing territorial and other disputes involving street performers, and coordinating uses at a public park — are no more, and perhaps less, substantial than those cited by the local governments in the door-to-door solicitation cases. *See, e.g.*, *Watchtower Bible*, 536 U.S. at 164-65 (the government's asserted interests included the prevention of crime and fraud and the protection of residential privacy).

In addition, as discussed in more detail below, the Center's permitting requirements have an impermissibly broad scope; do not meaningfully promote the City's asserted interests; and address interests that could be achieved through means far less intrusive than an individual speaker registration requirement. These considerations indicate that the regulation is not sufficiently narrowly tailored to meet the standard for a valid time, place, and manner regulation.

## 2. Narrow Tailoring

A narrowly tailored time, place, or manner restriction on speech is one that does not "burden substantially more speech than is necessary" to achieve a substantial government interest. *Ward*, 491 U.S. at 799. It must "target[ ] and eliminate[ ] no more than the exact source of the 'evil' it seeks to remedy." *See Frisby*, 487 U.S. at 485 (citation omitted). Moreover, although the chosen restriction "need not be the least restrictive or least intrusive means" available to achieve the government's legitimate interests, *Ward*, 491 U.S. at 798, the existence of obvious, less burdensome alternatives is "a rele-

magic act for groups of two or three others or for groups of one hundred or more. And nothing in the record indicates that crowds — even crowds of fifty or seventy-five people — gather around street performers at the Seattle Center. In other words, the Seattle Center's permitting requirement impinges on the very individual-to-small group interactions that even the Chief Judge acknowledges are not problematic.

vant consideration in determining whether the 'fit' between ends and means is reasonable," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993); *see also Santa Monica Food Not Bombs*, 450 F.3d at 1041.

The Center's permitting requirement fails the narrow tailoring test for three reasons. First, the requirement only marginally, if at all, promotes the City's asserted interests, suggesting that the government's interests would not "be achieved less effectively absent the regulation." *See Ward*, 491 U.S. at 799 (internal quotation marks and citations omitted). Second, less intrusive measures exist by which the City could achieve its alleged goals. Finally, the Center's permitting rule applies, on its face, to an extraordinarily broad group of individuals, the vast majority of whom are not responsible for the "evil" the City seeks to remedy. *See Frisby*, 487 U.S. at 485.

1.   The City asserts that the permitting requirement promotes its interest in protecting the safety and convenience of park-goers by reducing territorial disputes among performers, deterring harassment of audience members, and "clarifying and coordinating potentially competing uses." A "State's interest in protecting the 'safety and convenience' of persons using a public forum" is assuredly "a valid government objective." *Heffron v. Int'l Soc'y of Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981); *see also Thomas v. Chic. Park Dist.*, 534 U.S. 316, 323 (2002) ("Regulations of the use of a public forum that ensure the safety and convenience of the people are not inconsistent with civil liberties . . . ." (internal quotation marks and citation omitted)); *Cox v. State of New Hampshire*, 312 U.S. 569, 574 (1941). We have also held that, under appropriate circumstances, a permitting requirement governing the use of a public open space can further a legitimate interest in the regulation of competing uses of that space. *See Santa Monica Food Not Bombs*, 450 F.3d at 1042-43; *Long Beach Area Peace Network*, 522 F.3d at 1032-33.

**[4]** The City's asserted reasons for enacting the permitting regulations are thus substantial governmental interests. Unlike the restrictions in the cases just cited, however, the Center's permitting requirements do not promote those interests in any significant way.

There is, for example, no reason two street performers with permits would be less likely to engage in a territorial dispute than two street performers without permits. After all, under the Rules, a permit does not entitle a performer either to a particular territory or to a particular time period within a given territory. While the delineation of performance areas may help reduce such disputes, a permitting requirement is not inherent in such a space allocation system.

The Center's permitting requirement also bears no apparent connection to the City's stated interest in reducing hostile performer behavior. The City represents that the permits are freely issued, and that there is little, if any, screening process.[9] If so, then there is no reason why a performer with a permit is likely to be less hostile than one without a permit. In fact, several of the incident reports that the City introduced as evi-

---

[9]Although the City stated at oral argument that issuance of the permits is non-discretionary, we note that Rule F.2, which lists the "terms and conditions" for obtaining and retaining a permit, indicates otherwise. For example, Rule F.2 vests the Director with the power to revoke a permit "for convenience," thereby seeming to provide the Director with some measure of discretion over which performers are entitled to perform at the Center.

Rules that grant licensing officials undue discretion are not constitutional. *See Forsyth County*, 505 U.S. at 131 ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." (internal quotation marks and citations omitted)); *Thomas*, 534 U.S. at 323. Berger does not challenge the permitting requirement on undue discretion grounds, however. We therefore assume, without deciding, that Rule F.2 does not provide the Director with undue discretion over the permitting system.

dence of obstreperous performer conduct describe events that occurred after the introduction of the permitting requirement.

Moreover, the permitting requirement, as currently designed, does not aid in coordinating multiple uses of the Center's grounds. As already noted, the Rules place no limit on the number of permits that may be issued and do not assign particular performers to specific times or locations. As a result, the Center has no idea when or where a street performer intends to perform over the course of a permit year or how long any given performance will last. Because the permitting requirement does not resolve such uncertainties, it cannot help the Center "clarify[ ] and coordinat[e] potentially competing uses" of the park.

We recognize that limiting street performers to designated locations does, by definition, improve the coordination of multiple uses of the Center. But again, the permitting requirement does not assign particular performers to one or more of these designated locations, and therefore adds nothing to the Center's coordination scheme.

The Chief Judge implies that our opinion is in conflict with cases such as *Cox v. New Hampshire*, 312 U.S. 569 (1941) and *Poulos v. New Hampshire*, 345 U.S. 395 (1953) with regard to narrow tailoring to advance a significant governmental interest. Kozinski Dissent at 7808-09. That is simply not the case. In contrast to the Seattle Center's permitting requirement, the permitting schemes at issue in *Cox* and *Poulos* both required applicants to "specify the day and hour" that they planned to hold their parade or public meeting. *See Cox*, 312 U.S. at 571 & n.1; *Poulos*, 345 U.S. at 398 n.2. So the permits in *Cox* and *Poulos* did serve to further the government's interest in coordinating multiple uses of limited public space. The same cannot be said of the Seattle Center's permitting requirement, which is untethered to the time, place, length, or size of a planned performance.[10] In addition, both

---

[10]Chief Judge Kozinski describes our effort to distinguish *Cox* and *Poulos* on this ground as "clumsy." Kozinski Dissent at 7805. In the Chief

cases preceded the development by the Supreme Court of specific time, place and manner standards, and so, although still good law, are not examples of the application of modern doctrine to discrete circumstances.

Finally, the imperfect fit between the City's stated goals and the permit and badge requirements is evidenced by the Rules' significant underinclusiveness. Under the Rules, a group of as many as 99 people can gather without a permit to express their views, so long as they are not engaged in an artistic performance.[11] At the same time, an individual singing or dancing for a few friends would be required to register with the Director. This discrepancy makes little sense if, in fact, the City's primary motivation in passing the permit and badge requirements is to protect the safety and convenience of park-goers.

---

Judge's opinion, the fact that the City's permitting requirement allows the performer to "perform any time he wishes . . . for as long as he wishes" indicates that it is a less restrictive restraint on speech than those in *Cox* and *Poulos*.

The Chief Judge's argument misses our crucial point: it is the very fact that the permitting schemes in *Cox* and *Poulos* required applicants to specify the day and hour of their gathering that ensured that the restraints at issue did, in fact, promote the government's legitimate interest in coordinating multiple uses of a public space. In other words, the permitting requirement in *Cox* and *Poulos* accomplished more than the mere identification of potential speakers.

In this case, the City simply cannot argue that its permitting requirement promotes any possible coordination of use purpose. The *only* purpose that the City's permitting requirement serves is to force potential speakers to identify themselves to the government. Standing alone, such an interest is decidedly not constitutional, *see Watchtower Bible*, 536 U.S. at 166, and the Supreme Court has never held otherwise.

[11]The Rules also require individuals or groups to obtain a license if they use electrical power outlets, tables, temporary stages, flammable liquids, or sound amplification equipment. Rule E. This aspect of the Rules has not been challenged.

2. The City, the Chief Judge, and Judge Smith all maintain that the permitting requirement nonetheless promotes the City's asserted interests simply because a performer's fear of losing his or her permit will deter that performer from engaging in aggressive conduct and other non-rule abiding behavior. *See* Kozinski Dissent at 7810; Smith Op. at 7839. Along these same lines, the City contends that, without the ability to revoke a performer's permit, it would have no means of punishing violations of the Rules. These criticisms disregard the bedrock First Amendment presumption against prior speech restraints, and therefore against substituting an advance permitting process for after-the-fact enforcement. And, even if the permitting requirement does deter and help to punish unwanted behavior, "there are easily available alternative modes of regulation," *Santa Monica Food Not Bombs*, 450 F.3d at 1041, that would have considerably less impact on speech than the single-speaker prospective registration system.

Rather than requiring all speakers to pre-register with the government as a prerequisite to engaging in communicative activity, the City could simply enforce its existing rules against those who actually exhibit unwanted behavior.[12] For example, after appropriate hearings, the City might be able to suspend a rulebreaker's right to perform on the Center's grounds, or issue a fine.[13] *Cf. Madsen v. Women's Health Ctr.,*

---

[12]*See* Rule F.7.a (prohibiting performers from "treat[ing] any person or animal in a manner that is aggressive, menacing, vulgar, profane or abusive").

[13]According to one city official, "Before a street performer's permit is suspended, Seattle Center: 1) gathers information about the alleged rule violation(s); 2) sends the street performer notice of the alleged violation(s) and gives the performer the opportunity to respond; and 3) makes a decision based upon the alleged incident and the performer's response, if any." The City does not explain why this system would not function just as well if the penalty was the suspension of the performer's future right to perform at the Center, rather than the suspension of his permit.

*Inc.*, 512 U.S. 753, 776 (1994).[14] There is little reason to suspect that a performer would fear a suspension of her right to perform on the grounds or a significant fine any less than she would fear a suspension of her permit. The Supreme Court has consistently struck down prior restraints on speech where a state could achieve its purported goal of protecting its citizens from wrongful conduct by punishing only actual wrongdoers, rather than screening potential speakers. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (invalidating a restraint on charitable solicitation that purported to protect citizens from fraud and noting, "In striking down this portion of the Act, we do not suggest that States must sit idly by and allow their citizens to be defrauded. North Carolina has an antifraud law, and we presume that law enforcement officers are ready and able to enforce it."); *Vill. of Schaumburg*, 444 U.S. at 637 ("Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly."); *Schneider*, 308 U.S. at 162 (striking down ban on pamphleteering that was aimed at the prevention of littering in part because "[t]here are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets.").

---

[14]The City states that, absent the ability to suspend a performer's license, it would have no other option but to completely ban a non-rule-abiding performer from the Center's grounds. This argument is unpersuasive, for two reasons. First, there is no reason why identifying a performer who has had his privilege to perform on the Center's grounds suspended would be more difficult than identifying a performer who has had his permit suspended. Both would require an enforcement officer to consult a database which contained identifying information. The essence of the inquiry is no different.

Second, as a practical matter, the City does not appear to have had trouble identifying the limited number of street performers who regularly appear at the Center. The Appellee, "Magic Mike," is apparently quite well-known to the Center's security staff. In addition, its incident reports contain references to such distinctive characters as the hula-hooping magician and "the puppet guy."

In a related argument, Chief Judge Kozinski avers that the City's registration requirement promotes the City's interest in identifying rulebreakers and notifying them of alleged violations. *See* Kozinski Dissent at 7809-10 (stating that the permitting requirement serves the valid purpose of deterring unruly street performer behavior "by denying them the cover of anonymity, and [giving] the Seattle Center authorities a means of holding them accountable when they do misbehave"). This argument is unavailing, for three reasons. First, the requirement that potential speakers identify themselves to the government, and the concomitant loss of anonymity, is one of the primary *evils* the Supreme Court cited when it struck down the permitting requirement in *Watchtower Bible. See* 536 U.S. at 166-67. The Center's permitting requirement does not require only non-rule abiding street performers to identify themselves to the government. It requires *all* performers to "first inform the government of [their] desire to speak" in a public forum, *see Watchtower*, 536 U.S. at 165-66, and thereby forego their anonymity. The permitting rule's denial of anonymity to potential street performers, and the deterrent effect that such a denial has on some individuals' exercise of speech rights, weighs against the rule's constitutionality, not in its favor. *See Watchtower*, 536 U.S. at 166-67 & n.14.

Second, the City need not rely on a pre-registration scheme to determine the identity and addresses of problematic street performers. Seattle Center employees can, instead, ask the offending street performer to identify himself and provide an address, if necessary. This method is presumably the one employed by Seattle police officers when they enforce criminal statutes that prohibit such acts as disorderly conduct, *see* Seattle Mun. Code § 12A.12.010, and aggressive begging. *See* Seattle Mun. Code § 12A.12.015. Moreover, the Supreme Court has recently upheld so-called "stop and identify" statutes that require suspects to identify themselves to police officers. *See Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177 (2004). In other words, the City has the authority to ask

alleged rule violators to provide their identities. The registration system is therefore of only minimal additional usefulness, if any.

Third, as noted *supra* n. 14, the City does not appear to have had any practical difficulties uncovering the identities of the limited number of street performers who appear regularly at the Seattle Center.

The City's asserted interest in coordinating multiple uses of the Center could also be achieved as effectively without the permitting requirement. Although we do not uphold the Center's designation of sixteen performance locations on the present record, *see infra* Part IV, we also hold that the delineation of performance areas, particularly in the most sought-after locales, might pass constitutional muster on a more developed record. If so, a valid designated-location plan, in combination with the City's existing first-come-first-served rule, would achieve the same improvements in the coordination of multiple uses without a permitting system as it would with one. Conversely, if the designation of performance locations is not constitutionally valid, then the permitting scheme cannot be justified as enhancing the enforcement of an invalid designation.

**[5]** In short, by relying on an expansive, prophylactic prior restraint, the City has "burden[ed] substantially more speech than is necessary to further [its] interests." *Ward*, 491 U.S. at 799. The permitting system is entirely peripheral to the Center's need to enforce its Rules. Because the City's interests in punishing wrongful conduct could "be achieved [just as] . . . effectively absent the [permitting] regulation," *id.*, that regulation is not narrowly tailored to promote those interests. *See also Discovery Network*, 507 U.S. at 417 n.13 (holding that the availability of less restrictive alternatives is a relevant consideration in a narrow tailoring analysis).

**[6]** 3. There is a third, particularly compelling reason why the Center's permitting requirement fails the narrow tailoring

requirement: It applies to a large number of individuals who have no connection to the City's asserted reasons for the permitting requirement, thereby running afoul of the principle that the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799.

The permitting requirement is, according to the City, designed in part to reduce obstreperous conduct by street performers. Yet, by the City's own account, most street performers are not problematic.[15] So the permitting requirement burdens all performers to root out the occasional bad apple. By doing so, it fails to "target[ ] and eliminate[ ] no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485.

Similarly, the permitting requirement applies to street performers who pose no realistic coordination or traffic flow concerns, as well as to those who might. It is hard to fathom how an individual performing for two or three others in a park as large as the Center would pose coordination or traffic flow problems for the City. *See Santa Monica Food Not Bombs*, 450 F.3d at 1038-39 (noting that the type of coordination problems that justify the imposition of advance notification and permitting requirements arise in a public forum only when large groups are involved); *Grossman*, 33 F.3d at 1206 (same); *Long Beach Area Peace Network*, 522 F.3d at 1032-33 (same); *City of Dearborn*, 418 F.3d at 608 ("The city of Dearborn's significant interest in crowd and traffic control, property maintenance, and protection of the public welfare is not advanced by the application of the Ordinance to small groups."). The City has not provided any evidence that street performers usually, or even sometimes, gather crowds of the size that might justify coordination-of-use permits — accord-

---

[15]The City reports that, in the year prior to the introduction of the revised Rules, 70% of the performer-related complaints it received were either generated by or were in reference to "Magic Mike" Berger.

ing to *Long Beach Area Peace Network*, 522 F.3d at 1033, seventy-five or more people. Once again, the permitting requirement here burdens substantially more speech than necessary to promote a legitimate government objective.

**[7]** The unconstitutional breadth of the permitting requirement is perhaps most apparent in the City's definition of "street performer," the group to whom the permitting rules apply. According to Rule C.15, a "Street Performer" is "a member of the general public who engages in any performing art or the playing of any musical instrument, singing or vocalizing, with or without musical accompaniment . . . ." This definition is extraordinary in its sweep.[16] It includes not only the few problematic street performers who perform repeatedly and for pay, but also any individual who wishes to sing, dance, or play an instrument while on the Center's grounds. Protest songs, playing the guitar at a picnic, even whistling are swept up into this broad definition. An individual strumming on a guitar at a family picnic surely poses no problem to the safety and convenience of fellow park-goers. Yet, that person, like many others, would need to obtain a permit.

The City urges us to read the definition more narrowly than its text would suggest. It contends that the Rules apply only to those performances that are "aimed at attracting an audience," and so are not unconstitutionally broad.

It is a "well-established principle that statutes will be interpreted to avoid constitutional difficulties." *Frisby*, 487 U.S. at 483. Thus, where an unconstitutionally broad statute is "readily subject to a narrowing construction" that would eliminate its constitutional deficiencies, we accept that construction. *See id.* at 482; *see also Ctr. for Bio-Ethical Reform, Inc., v. L.A.*

---

[16]Although inclusion of the term "vocalizing" could be read to apply the permitting requirement to any individual who wished to speak out loud while traversing the Seattle Center's grounds, we assume that the permitting rules apply only to those engaged in artistic expression.

*County Sheriff's Dep't*, 533 F.3d 780, 791-93 (9th Cir. 2008) (construing an ambiguous statute narrowly to avoid First Amendment problems).

In this case, though, even if we were to hold that the published "street performer" definition is "readily subject" to the proposed narrowing construction, the revised definition would be no less constitutionally infirm, for two reasons. First, most performers seek to "attract a crowd," even if that crowd turns out to be composed of only two or three people. The City's "narrower" rule is therefore only marginally less broad, if less broad at all, than the original.

In *Santa Monica Food Not Bombs*, we invalidated a rule that required any individual who advertised an event on the radio or television to obtain a permit, regardless of the number of people who attended the event. *See* 450 F.3d at 1043. We noted that the permit would have been narrowly tailored if it had applied to events that *actually* attracted a crowd of more than 150 people, even if the number of attendees was unknown before the event. *Id.* In other words, the City of Santa Monica was allowed to hold an organizer responsible for obtaining a permit if the event actually attracted a significant crowd, but not because the event *might conceivably* attract such a crowd. Similarly, here, the City could draft a rule for the Seattle Center that requires performances that attract an audience of a given size to obtain a permit, and enforce that rule for performances that actually attract that size audience. What it cannot do is require permits for all performances at the Center, regardless of the size of the crowd.[17]

---

[17]In support of their argument that the Center's permitting requirement is constitutional, Chief Judge Kozinski and Judge Gould cite *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002) for the proposition that the Supreme Court has previously "[upheld a] permitting requirement for large events in public parks." Gould Dissent at 7821; Kozinski Dissent at 7804-05, 7809. As noted, regulating "street performers" is not tantamount to regulating "large events." More importantly, as we have twice noted,

Second, the City's proposed limitation would make an otherwise clear, though overbroad, regulation unconstitutionally vague. *See Foti v. City of Menlo Park*, 146 F.3d 629, 638-40 (9th Cir. 1998). *Foti* invalidated a city ordinance that prohibited drivers from displaying signs on their parked vehicles if, and only if, those signs were designed to "attract the attention of the public." *Id.* at 638. We found this standard unconstitutionally vague, because it required those enforcing the ban to "decipher the driver's subjective intent" based on such factors as the driver's chosen parking space, the amount of traffic passing by the chosen parking spot, and the physical characteristics of the sign. *Id.* at 638-39. Our concern was that, "[w]ith this range of factors to consider, . . . a police officer might resort to enforcing the ordinance only against . . . [those] messages the officer or the public dislikes." *Id.* at 639.

The City's limiting construction mimics the language of the ordinance declared unconstitutionally vague in *Foti* and so fares no better than that ordinance. A Seattle police officer attempting to enforce the Center's permitting requirement would have to decide whether a performer intended "to attract a crowd." The officer would presumably make such a determination based on factors such as the performer's chosen location, volume, flamboyance, and, worst of all, subject matter. As in *Foti*, this myriad of factors lends itself to discriminatory enforcement.

---

"*Thomas* considered only a challenge to the breadth of official discretion, not the other requirements of the time, place, and manner jurisprudence." *Santa Monica Food Not Bombs*, 450 F.3d at 1037 n.15 (citing *Galvin v. Hay*, 374 F.3d 739, 747 n.5 (9th Cir. 2004) (internal alterations and quotations omitted)). Notably, the *Thomas* Court did not consider, because the issue was not raised, whether the Chicago Park District's fifty-person threshold was high enough to meet constitutional standards. Our caselaw indicates that it may be too low. *See Long Beach Area Peace Network*, 522 F.3d at 1033; *Santa Monica Food Not Bombs*, 450 F.3d at 1043. In any event, because *Thomas* addressed a specific type challenge that is not raised here, it is not useful in evaluating the constitutionality of the Center's permitting requirement.

Moreover, a prospective performer would need to anticipate how an officer might interpret the performance. Even if the performer had no intent to "attract an audience," he or she would have to evaluate whether an officer might think so. This uncertainty is likely to have a chilling effect on speech. *See id.* at 638 ("A statute must be sufficiently clear so as to allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.' ") (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972))).

In short, far from saving Rule C.15 and its associated Rules from constitutional ignominy, the City's proffered limiting construction makes matters worse.

## 3.  Conclusion

**[8]** Overall, like the invalid permitting scheme in *Grossman*, the City's regulations, "[r]ather than being narrowly tailored to protect speech, . . . [are] tailored so as to preclude speech." *Grossman*, 33 F.3d at 1207. We therefore hold that Rules F.1 and F.2 are unconstitutional.[18] As currently drafted, the Center's permitting requirement does not meaningfully advance the City's asserted interests. Instead, it requires single individuals to inform the government of their intent to engage in expressive activity in a public forum, a requirement that neither we nor the Supreme Court has *ever* countenanced. In addition, its broad sweep prohibits much more speech than the "evil[s]" it seeks to remedy require, and the main objectives of the City's advance registration scheme could be achieved by far less intrusive means. For all these reasons, the

---

[18]The Seattle Center's badge requirement is intimately connected to the permitting requirement. *See* Rule F.1 ("Permits, when issued, shall be evidenced by a badge that shall be worn or displayed by the performer in plain view at all times during a performance."). Because we hold the Center's permitting requirement unconstitutional and because no badges of the kind required can be issued without permits, we need not separately evaluate the constitutionality of the badge requirement.

Center's permitting requirement is not a reasonable time, place, or manner restriction.

## IV.   Rule F.5: The Performance Location Rule

### A.   *Overview of the Rule*

Rule F.5 limits street performers to sixteen "designated locations on the Seattle Center grounds," identified on a map that accompanies each Street Performer Permit. The map also indicates the "maximum number" of performers, typically no more than two, who may perform at each location simultaneously. If the Director determines that a given performance interferes with other users of the Center's grounds or "aggravates foot traffic congestion," the Rule permits the Director to "relocate performers" to other designated areas.

### B.   *Constitutionality of Rule F.5*

The summary judgment record is insufficient to establish that the performance location rule is unconstitutional. As with other time, place, or manner restrictions on speech in a public forum, the government bears the burden of justifying a location restriction. *See Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 858-63 (9th Cir. 2004); *see also United States v. Playboy Entm't Group*, 529 U.S. 803, 816-17 (2000); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50-52 (1986). Viewing the available evidence in a light most favorable to the City, *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), we conclude that a genuine issue of material fact exists as to whether the City met this burden, and that summary judgment for Berger was therefore not merited. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The City submitted evidence, which Berger does not dispute, that, before the introduction of the location restriction, it received weekly complaints from park tenants about street

performers blocking entranceways and egresses. The City's evidence also indicates that street performers regularly engaged in disruptive and volatile territorial disputes. Viewing this uncontested evidence in a light most favorable to the City, we conclude that the City met its burden of establishing that a significant problem exists. *See Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) ("[A] governmental body seeking to sustain a restriction . . . must demonstrate that the harms it recites are real . . . .").

Moreover, unlike the Center's permitting requirement, the location rule does promote the City's interest in reducing these problems. By delineating precise performance locations, the City can assure itself and park tenants that street performers are not blocking entrances, exits, and pathways. Similarly, well-defined performance areas, combined with the Center's first-come, first-served rule, reduce territorial disputes by eliminating uncertainty over the permissible boundaries of a given performance.

In addition, the performance location rule, unlike the permitting requirement, passive solicitation, and captive audience rules, is not overbroad on its face. *See Bd. of Airport Comm'rs of the City of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574-75 (1987) (striking down, on overbreadth grounds, a regulation that prohibited individuals from engaging in "any First Amendment activities" within an airport terminal).[19]

**[9]** The only issue, then, is whether the location restriction leaves open "ample alternative channels for communication." *Ward*, 491 U.S. at 791. As we explained in *Long Beach Area Peace Network*, "an alternative is not ample if the speaker is

---

[19]The performance location rule is overbroad in the sense that it relies on a constitutionally infirm definition of "street performer." *See supra* Part III.B.2. If the City plans to defend the constitutionality of the performance location rule on remand, it must also provide a narrowing construction that comports with the principles discussed in Part III.B.2.

not permitted to reach the intended audience." 522 F.3d at 1024.

On summary judgment, we are, of course, required to draw all reasonable inferences in favor of the non-moving party. *See Anderson*, 477 U.S. at 255. In support of its argument that the sixteen designated locations provide adequate access to audiences, the City provides a single piece of evidence: a map of the Seattle Center that includes the chosen locations.[20] As the dissenters point out, the map shows that the designated performance areas are near to several key Seattle Center attractions, including the Space Needle, the Key Arena, and the Experience Music Project. Many of the locations also appear to be directly adjacent to the Center's major pedestrian thoroughfares. The map therefore permits us to draw the reasonable inference that the chosen locations provide street performers with access to most park-goers and therefore to their intended audience.

Berger challenges this inference, and in support of that challenge, introduces his own declaration. In that declaration, he asserts that "many [of the locations] are far off the walkways where it is very difficult to notice the performer." He also avers that "Other times the Center has trucks or equipment or construction blocking locations for weeks on end." Although these statements raise an inference that the chosen locations do not provide adequate access to a street performer's audience, they do not compel that conclusion as a matter of law. Nor does Berger supply additional evidence that would preclude us from drawing an inference in favor of the City.

---

[20]The City asserts that the number and location of the performance areas were determined through a public process in which street performers participated. The City has yet, however, to introduce any of the details or specific results of this public process. Inquiry into such details would go a long way towards determining the adequacy of the chosen locales.

**[10]** Because we must draw all reasonable inferences in favor of the City, and because there is conflicting evidence concerning whether the sixteen dedicated locations provide adequate access to the intended audience, summary judgment for Berger on the issue of Rule F.5's constitutionality is not appropriate on the current record.

To be clear, we do not hold that Rule F.5 is constitutional. Berger's evidence, though sparing, is sufficient to support a reasonable inference that the designated locations do not provide access to his intended audience. Rather, we are simply ruling that, on the current summary judgment record, there are conflicting inferences to be drawn regarding material facts pertinent to the dispositive consideration, adequacy of access to the intended audience.

## V.   Rule F.3.a: The Passive Solicitation Rule

### A.   *Overview of Rule*

Rule F.3.a states: "No performer shall actively solicit donations, for example by live or recorded word of mouth, gesture, mechanical devices, or second parties." The Rule does allow performers "passively" to solicit donations by setting out a receptacle that "may include a written sign that informs the public that such donations are sought."

### B.   *Constitutionality of Rule F.3.a*

Speech that solicits funds is protected by the First Amendment. *See Vill. of Schaumburg*, 444 U.S. at 628-32; *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 677 (1992). Rules that regulate solicitation in public fora are therefore subject to the same standards as those that limit other forms of speech. *See Lee*, 505 U.S. at 703-04 (Kennedy, J., concurring); *see also ACLU of Nev. v. City of Las Vegas (ACLU II)*, 466 F.3d 784, 792 (9th Cir. 2006); *ACORN v. City of Phoenix*, 798 F.2d 1260, 1267 (9th Cir. 1986). In other

words, solicitation regulations must be content-neutral, narrowly tailored, and leave open reasonable alternative channels for expression. *Id.* If a regulation is not content-neutral, we apply strict scrutiny. *See Playboy Entertainment Group*, 529 U.S. at 813; *Perry Educ. Ass'n*, 460 U.S. at 45. Under that standard, the regulation is valid only if it is the least restrictive means available to further a compelling government interest. *Id.* We hold that the Center's active solicitation ban is a content-based regulation, and that it does not satisfy the exacting standard for a valid content-based regulation.

### 1. Content-based

A regulation is content-based if either the underlying purpose of the regulation is to suppress particular ideas, *see Ward*, 491 U.S. at 791, or if the regulation, by its very terms, singles out particular content for differential treatment. *See Turner Broad. Sys. ,Inc. v. FCC*, 512 U.S. 622, 642-43 (1994); *see also Discovery Network*, 507 U.S. at 429.

The City asserts, and we have no reason to doubt, that it passed its active solicitation ban in an effort to protect Center patrons from harassment. That is a legitimate, non-content-based purpose, and Rule F.3.a is therefore content-based only if it discriminates against speech on its face on the basis of content. It does.

**[11]** First, the City's suggestion to the contrary notwithstanding, Rule F.3.a *does* regulate speech, not conduct. As we explained at length in *ACLU II*, regulations that ban certain *conduct* associated with solicitation do not violate the prohibition on content-based regulation of speech. *See* 466 F.3d at 794-96. A ban on the actual hand-to-hand exchange of money, for example, is not content-based speech regulation. *See Lee*, 505 U.S. at 705 (Kennedy, J., concurring) (stating that a ban on in-hand donations was not a content-based regulation of speech because it was "directed only at the physical exchange of money"); *see also ACLU II*, 466 F.3d at 795

(relying on Justice Kennedy's concurrence in *Lee*). But Rule F.3.a *allows* the conduct — exchange of money. It regulates only the speech, by specifying the medium and manner of requesting money — only in writing, and only passively.

**[12]** Second, Rule F.3.a *is* content-based by its very terms. It specifically restricts street performers from communicating a particular set of messages — requests for donations, such as "I'd like you to give me some money if you enjoyed my performance." Performers are otherwise free to communicate whatever ideas they like, however they wish. As we stated with respect to a similar solicitation ban in *ACLU II*, while "this distinction [may be] innocuous or eminently reasonable, it is still a content-based distinction because it 'singles out certain speech for differential treatment based on the idea expressed.' " *See ACLU II*, 466 F.3d at 794 (quoting *Foti*, 146 F.3d at 636 n.7).

In other words, although the Center's active solicitation rule regulates the "manner" in which street performers may express themselves, it does so based on the content of the performer's message. A performer at the Seattle Center need not rely on a sign, for example, to express his or her views on a political candidate; she can use her voice. To use another example, Rule F.3.a is no better than a regulation that forbids those addressing abortion issues, but not those protesting war, from giving speeches in a park, but allows abortion protestors and supporters to pass out leaflets about abortion. As these examples show, one can regulate the manner of speech on the basis of content, taking the regulation outside the time, place, and manner rubric, even though *some* manner of communication on the subject is allowed.[21]

---

[21]In dissent, Judge Gould confuses viewpoint-neutrality with content-neutrality. Gould Dissent at 7826 (noting that "there are no favored organizations or persons — no street performer advancing any cause can solicit funds from Seattle Center patrons in an active way"). The Center's passive solicitation rule is certainly viewpoint-neutral in that it affects all street performers regardless of their message. But, for the reasons discussed above, it is nonetheless content-based, as it singles out certain content for special treatment.

Our conclusion that the active solicitation ban is content-based is supported — but not determined — by the fact that an officer seeking to enforce the active solicitation ban "must necessarily examine the content of the message that is conveyed." *Forsyth County*, 505 U.S. at 134 (internal quotation marks and citations omitted); *see also ACLU II*, 466 F.3d at 796 n.12. How else would an officer determine whether a performer's tip-of-the-cap was accompanied by a permissible "Thank you" or a prohibited "Please give?"[22]

[13] In short, Rule F.3.a is a content-based limitation on speech. That it only restricts, rather than completely bans, particular content makes it no more content-neutral.[23]

---

[22]That an officer must evaluate the content of a message to determine whether a regulation applies is *evidence* that the regulation is content-based, although it is not dispositive. *See Forsyth County*, 505 U.S. at 134. The "officer must read it" test is not always determinative of the issue of whether a regulation is facially content-based. *See Ctr. for Bio-Ethical Reform*, 533 F.3d at 789 n.5 ("Whether an officer must read a message is persuasive evidence of an impermissible content-based purpose, but is not dispositive.").

[23]In *ACORN*, we held that a City of Phoenix ordinance prohibiting the solicitation of donations from people in vehicles stopped at red lights was content-neutral. 798 F.2d at 1267-68. We also noted approvingly that the ordinance did not enjoin individuals from otherwise distributing literature to or orally communicating with vehicle occupants. *Id.* at 1271. Read broadly, this holding would conflict with our current conclusion, as well as with our holding in *ACLU II*. *See ACLU II*, 466 F.3d at 794 (holding that a ban on solicitation, but not on other messages, was content-based).

We do not interpret ACORN so broadly, however. We see no indication that the ordinance at issue forbade passing out handbills asking car drivers or passengers to contribute by mail to a charity or cause, as opposed to soliciting on-the-spot donations. That is, the ordinance at issue in *ACORN*, like that in *Lee*, prohibited only the immediate physical exchange of money. *See Lee*, 505 U.S. at 704-05 (Kennedy, J., concurring). Such a regulation is not a content-based regulation of speech, and so does not run afoul of the content neutrality requirement.

### 2.    Strict scrutiny

**[14]** As a content-based regulation, the ban on active solicitation is valid only if it serves a compelling government interest in the least restrictive manner possible. Rule F.3.a does neither, and so is not one of the "rare . . . regulation[s] restricting speech because of its content" that is "permissible." *See Playboy Entertainment Group*, 529 U.S. at 818.

As a general matter, it is unlikely the City's asserted interest in reducing obnoxious behavior by street performers could ever be considered compelling. *See S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1146 (9th Cir. 1998) (noting that, although the government "may have a substantial interest in preventing solicitors from harassing pedestrians on public streets and sidewalks[,] . . . these substantial interests . . . may not be compelling"). This stated interest pales in comparison to those interests the Supreme Court has found compelling in a First Amendment context. *See Burson v. Freeman*, 504 U.S. 191, 198-200 (1992) (plurality opinion) (reducing voter intimidation and election fraud); *Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 232 (1989) (protecting "the integrity of the electoral process"); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (safeguarding "the basic human rights of members of groups that have historically been subjected to discrimination"); *see also Alaskan Independence Party v. Alaska*, 545 F.3d 1173, 1180 (9th Cir. 2008) (elimination of fraud and corruption in the state election process); *Cal. Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1179 & n.8 (9th Cir. 2007) (disclosure of political information to the electorate).

But even if reducing aggressive solicitation qualifies as a compelling interest, the Center's passive solicitation rule is far from the least restrictive means by which the City could discourage "pushy" or "overbearing" solicitation. Rule F.3.a bars *all* active solicitation. It reaches innocuous verbal requests for donations; it prohibits a performer from "gestur-

[ing]" towards the passive receptacle that the Rules permit the performer to display. Yet, "[a] complete ban can be narrowly tailored . . . only if each activity within the proscription's scope is an appropriately targeted evil." *Frisby*, 487 U.S. at 485. Rule F.3.a cannot possibly meet that standard.

If the City desires to curb aggressive solicitation, it could enforce an appropriately worded prohibition on aggressive behavior. If necessary, the City can also rely on constitutionally valid nuisance and aggressive panhandling laws to control street performers who will not take no for an answer when asking for money.

**[15]** The Supreme Court in *Village of Schaumburg* observed that "[t]he [local government's] legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation. Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly." 444 U.S. at 637; *see also Riley*, 487 U.S. at 795; *Schneider*, 308 U.S. at 164. Similarly, punishing offensive conduct *after* it has occurred is indubitably a less restrictive way to protect audiences from serious annoyances than banning all forms of active solicitation, whether problematic or not. The City's sweeping ban is simply not the least restrictive means of reducing overbearing street performer behavior. It therefore cannot stand.

## VI.  Rule G.4: The Captive Audience Rule

### A.  *Overview of the Rule*

Unlike the rules we have already discussed, Rule G.4 applies to all speakers, not just to street performers. It prohibits all "speech activities . . . within thirty (30) feet of any captive audience." "Speech activities" include "both political speech and commercial speech[,]" but do not include "activi[-ties] conducted by City employees or licensed concessionaires." Rule C.14. A "captive audience" is

any person or group of persons: 1) waiting in line to obtain tickets or food or other goods or services, or to attend any Seattle Center event; 2) attending or being in an audience at any Seattle Center event; or 3) seated in any seating location where foods or beverages are consumed.

Rule C.5.

## B. *Constitutionality of Captive Audience Rule*

**[16]** The Center's "captive audience" Rule is the most troublesome of the challenged regulations, striking at the very core of the precepts underlying the protection of speech in traditional public fora. The Rule's very purpose — according to the City — is to "protect" many of the individuals who have gathered at the Center, a public forum, from efforts by fellow citizens to communicate with them. That purpose is squarely at odds with the fundamental principle of our traditional public forum jurisprudence — namely, that use of parks for public discussion and gathering "has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens" and "must not, in the guise of regulation, be abridged or denied." *See Hague*, 307 U.S. at 515-16. The seminal captive audience case, *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974), specifically abjured any such application of the captive audience concept, recognizing that a public street car is not a "First Amendment forum" like a "park," "where First Amendment values inalterably prevail." *Id.* at 302-04.

**[17]** And, indeed, from "time out of mind," public parks have been central to our constitutional heritage of open discourse. *See Hague*, 307 U.S. at 515. They provide an essential outlet to those who, for economic or other reasons, would not otherwise be able to participate in that discourse. *See Grossman*, 33 F.3d at 1205 n.8. Given the importance of these locales, we cannot countenance the view that individuals who choose to enter them, for whatever reason, are to be protected

from speech and ideas those individuals find disagreeable, uncomfortable, or annoying. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910-11 (1982).[24]

[18] The Supreme Court's "captive audience" jurisprudence fully supports our conclusion that public park-goers, in general, are not a protectable captive audience for constitutional purposes. "The plain, if at times disquieting, truth is that in our pluralistic society, constantly proliferating new and ingenious forms of expression, we are inescapably captive audiences for many purposes." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975) (internal quotation marks and citation omitted). Only in "narrow circumstances" may government restrain speech to protect such audiences. *Id.* at 210-11. "The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen v. California*, 403 U.S. 15, 21 (1971).

Such substantial privacy interests include "the psychological [and] physical well-being of the [hospital] patient held 'captive' by medical circumstance." *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 768-71 (1994) (validating an injunction creating a 36-foot buffer zone around entrances of an abortion clinic in which picketing and demonstrating, among other activities, were barred); *see also Hill v. Colorado*, 530 U.S. 703, 728-30 (2000) (upholding an eight-foot regulatory buffer around clinic entrances due to the "unique concerns that surround health care facilities," where those using the facilities "are often in particularly vulnerable physical and emotional conditions"). They also encompass "the quiet enjoyment" of one's home. *Frisby*, 487 U.S. at 483

---

[24]"Fighting words" are, of course, proscribable under the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 359 (2003) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)).

(upholding a ban on "focused picketing taking place solely in front of a particular residence").

The unique privacy and self-determination interests involved in protecting medical facilities and residences simply do not exist for those waiting in line or having lunch outdoors in a public park. Indeed, we have already rejected such a comparison in *Kuba*, 387 F.3d at 861 n.10, explaining that patrons of a "place of public entertainment" were not a captive audience similar to the intended audiences in *Madsen* and its progeny, because they were obviously not "particularly vulnerable," as are the patients and doctors in such cases.

Moreover, even if Seattle Center officials could justify a prohibition on unwelcome speech, the current "captive audience" regulation would still be too broad because it prohibits *all* "speech activities," not just those that continue after the recipient of the speech has signaled a preference to be left alone. *See Jews for Jesus*, 482 U.S. at 574-75 (holding that a regulation was constitutionally overbroad where it prohibited all "First Amendment activities" and noting that "no conceivable governmental interest would justify such an absolute prohibition of speech"); *see also Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 383-84 (1997) (holding that an injunction provision that required abortion protestors to move away from abortion clinic patients who asked to be left alone did not violate the First Amendment).

The implications of upholding the Seattle Center's "captive audience" regulation are startling. Doing so would permit the almost unlimited regulation of speech in a public park. After all, any visitor to a park, even one strolling through the park, is "captive" in a particular spot, in that the visitor might have reason to stay where she is rather than move to another location in the park or to a different park. There is no reason to suspect that a group of runners on a park track, parents watching their children in a playground, or an individual sitting in her favorite spot are any less "captive" — i.e., less interested

in staying where they are rather than moving to a different location — than those who are waiting in line or eating while seated in a designated area.

**[19]** In sum, we hold that public park-goers are not a "captive audience."[25] Any interest they may have in pursuing such activities as waiting in line, attending an event, or eating without communication by others is not a "substantial privacy interest."

**[20]** Moreover, even if the City's purported interest in protecting certain park-goers from communications by others were substantial — which it is not — Rule G.4 is not narrowly tailored to meet that interest. This is so for two reasons.

First, the rule's preference for concessionaires and licensees leads to the odd result that purely commercial speech, which receives more limited First Amendment protection than noncommercial speech, is allowed and encouraged, while artistic and political speech is not. This bias in favor of commercial speech is, on its own, cause for the rule's invalidation. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 513 (1981) (plurality opinion); *see also G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1081 (9th Cir. 2006) (ordinance is invalid if it favors commercial speech over noncommercial speech); *Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 819-20 (9th Cir. 1996) (same).

Second, Rule G.4 is unconstitutionally broad. *See Bd. of Airport Comm'rs of City of L. A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574-75 (1987). In *Jews for Jesus*, the Court invali-

---

[25]Although we hold that Center patrons are not a "captive audience" for First Amendment purposes when frequenting the Center's public open areas, we certainly do not mean to suggest that the City could not promulgate rules that prohibit and punish disruptive conduct during planned Center events or at indoor Center venues. As discussed below, such a rule would, of course, have to be much more narrowly tailored than the sweeping ban on speech that the City has adopted here.

dated, on overbreadth grounds, a regulation that prohibited individuals from engaging in any "First Amendment activities" within the Central Terminal of Los Angeles International Airport. *Id.* at 574. In striking down the rule, the Court noted that "[t]he resolution does not merely regulate expressive activity in the Central Terminal Area that might create problems such as congestion or the disruption of the activities of those who use LAX[;] . . . it prohibits even talking and reading, or the wearing of campaign buttons or symbolic clothing." *Id.* at 574-75. "We think it obvious that such a [sweeping] ban cannot be justified . . . because no conceivable governmental interest would justify such an absolute prohibition of speech." *Id.* at 575.

The Center's "captive audience" rule — which prohibits all "speech activities . . . within thirty (30) feet of a captive audience" — is similarly overbroad in its sweep. By its very terms, Rule G.4 prohibits both welcome and unwelcome communications, both verbal tirades and silent protests, both offensive language and the mildest remark. It would, for instance, forbid a political campaign representative from offering a handbill to a consenting park-goer in an entirely benign — even silent — manner. It would likewise prevent a concerned citizen from displaying a sign critical of the city government. Such passive and unthreatening acts certainly do not intrude on the privacy of park-goers in "an essentially intolerable manner," if they intrude at all. *See Cohen*, 403 U.S. at 21. Thus, by flatly prohibiting all "speech activities," the Center's "captive audience" rule, like the regulation in *Jews for Jesus*, "does not merely regulate expressive activity in the [Center] that might create [the alleged] problems." 482 U.S. at 574. No governmental interest — and certainly not an interest in protecting public park-goers from unwanted communications — could justify such a sweeping ban. *See id.*

Rule G.4 also creates precisely the type of "floating buffer zone[ ]" that the Court found unconstitutional in *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357,

377-80 (1997). In *Schenck*, the Court considered an injunction which barred demonstrations within fifteen feet of any person or vehicle using an abortion clinic. *Id.* at 367. According to the court, the "floating" fifteen foot zones created by the injunction created an uncertain and over-broad system of restraints on speech. *Id.* at 377-80. As clinic patients moved, speech-restricted areas shifted across the landscape in an unpredictable and, in the Court's view, unacceptable manner. *Id.*

Rule G.4's thirty-foot buffer zone generates the same unpredictability problems here. As the end of a line shifts, or a picnic table is occupied, the Center's captive audience rule snaps on to bar speech within thirty feet of the line or the picnickers. This system of shifting "speech-free" zones is the sort of capricious restraint, likely to chill far more speech than the Seattle Center would be justified in regulating, that *Schenck* struck down. 519 U.S. at 377-80.

**[21]** In sum, the City's "captive audience" rule not only fails to address a substantial government interest, it also burdens considerably more speech than necessary to achieve its purported goals. Rule G.4's flat ban on all speech activities encompasses a broad compendium of expressive activity, much of which is not disruptive or unduly invasive of the privacy interests of allegedly "captive" park-goers. In addition, the rule promulgates unconstitutionally vague "buffer" zones that are likely to chill otherwise permissible speech. For all these reasons, the "captive audience" rule cannot stand.

## VII.   Response to the Dissenters

Although we have responded to specific points raised by the dissent throughout this opinion, we wish to address two broader concerns that we have with the various dissents.

First, in order to bolster their arguments, both Chief Judge Kozinski and Judge Gould mischaracterize both the nature of

the Center's rules and our analysis of those rules. Chief Judge Kozinski, for example, repeatedly suggests that the rules apply only to those performers who solicit money. *See, e.g.,* Kozinski Dissent at 7799-7800 (noting that the rules are intended to protect park-goers from "overly aggressive street performers bent on increasing their own visibility and income"); *id.* at 7806 ("[S]treet performers like Berger are not merely citizens who wish to use the park as a forum for public expression or religious worship on an occasional basis; they are operating a business and earning a living from these activities."); *id.* at 7807 ("The commercial aspects of the street performer trade, which my colleagues overlook, set up the dynamics that have given Seattle Center cause for concern."). That understanding of the rules is simply wrong. No such limitation appears in the Center's rules, nor has it been propounded by the City. Instead, the permitting requirement applies, on its face, to all "member[s] of the general public who engage[ ] in any performing art or the playing of any musical instrument, singing or vocalizing," Rule C.15. It does not distinguish between performers who seek funds and those who merely wish to entertain or to express an opinion through performance art. The City's "captive audience" rule goes even further. It applies to *all* park-goers, not just to street performers, and certainly *not* just to street performers who solicit funds. The City has not argued otherwise.

The dissenters also imply that the rules are limited to repeat performers, *see* Kozinski Dissent at 7806, 7808, and to preventing "unwelcome or harassing performances." *See* Gould Dissent at 7829. Once again, the scope of the rules at issue is not limited to these categories, nor has the City so interpreted them. The permitting requirement and passive solicitation rules apply to one-time performers and to Seattle Center regulars in equal measure. The sweeping "captive audience" rule applies to everyone (other than City employees and licensed concessionaires) at all times. In addition, none of the rules differentiate between benign, inoffensive conduct and aggres-

sive, unwelcome acts. They simply deter or ban all relevant speech.

We do not discount the City's interest in protecting patrons of the Seattle Center from "browbeating" and other hostile conduct. The problem is that the City, rather than tailoring its rules to curtail problematic behavior, imposed sweeping bans on expressive activity and implemented a broad registration requirement. It is, in large part, the overbreadth of the rules, an overbreadth the dissenters do not appear to recognize, that renders them constitutionally infirm. *See Jews for Jesus*, 482 U.S. at 574-76.

Chief Judge Kozinski also mischaracterizes, or perhaps misunderstands, key aspects of our opinion. For instance, he asserts that "it is a wholly different matter to derive some sort of rule that prohibits — or strongly discourages — regulation of speech by a single individual, regardless of the size of his expected audience or the disruption he may cause." Kozinski Dissent at 7814. The "rule" that we propose is precisely the opposite of what the Chief Judge suggests. One of the central deficiencies of the Center's permitting requirement is that it does *not* consider the size of a street performer's expected audience or "the disruption he may cause." It applies to every member of the "general public" who wishes to perform, sing, or vocalize on the Center's grounds, irrespective of the size of their planned or actual audience. If, by contrast, the permitting requirement applied only to performers who intend to attract a crowd of a sufficiently large size (say 100 persons or more), the requirement might very well be constitutional. For this reason, Judge Kozinski's suggestion that our opinion would preclude a permit requirement for the famous civil rights leader who plans to hold a rally for half a million people at the Lincoln Memorial is absurd. Instead, the point is that the Center's permitting requirement is not limited to huge rallies — or even small, hundred person ones.

Moreover, our conclusion that the Constitution prohibits the government from implementing a registration system that

governs speech in a public forum and applies to groups as small as a single individual performing without an audience is neither new nor idiosyncratic. This circuit has repeatedly affirmed the principle that an advance notification requirement applicable to speech in a public forum must be limited to larger groups. *See Long Beach Area Peace Network*, 522 F.3d at 1032-33; *Santa Monica Food Not Bombs*, 450 F.3d at 1039; *Grossman*, 33 F.3d at 1206; *City of Richmond*, 743 F.3d at 1355; *Rosen*, 641 F.2d at 1247-48. Several other circuits have reached this same conclusion. *See Cox v. City of Charleston*, 416 F.3d 281, 285 (4th Cir. 2005); *American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005); *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996). The dissenters ignore this long line of authority, concluding simply that a "rigid numerical rule will fail because it makes no account for the performance's effect on others." Kozinski Dissent at 7817. But, as we and several other appellate courts have noted, a numerical floor is necessary precisely *because* such a floor indicates that the government has properly tailored its permitting requirement to address the effect that a speaker will have on other users of a public space.

We also reiterate that the City is free to enforce its existing rules, including its criminal statutes and traffic ordinances, against individual offenders. We do not hold, as Chief Judge Kozinski's other, equally silly, examples appear to suggest, *see* Kozinski Dissent at 7814-16, that the First Amendment exempts all individual speakers from regulation. If Yo-Yo Ma or Mr. Nez decided unilaterally to obstruct vehicle traffic, the government can, of course, prevent him from doing so by enforcing its vehicular codes. Similarly, Seattle Center officials can, pursuant to its existing rules, remove a street performer who is blocking pedestrian traffic or harassing parkgoers. But a permitting requirement that applies to a group as small as a *single* person and which governs speech activity in a public park (*not* on a city street) is not necessary to promote

the interests the City asserts in this case and is highly offensive to our constitutional values.

Which leads to our second — and overriding — general concern with the approach of the dissenters: the dissents ignore, or at least discount, bedrock principles of First Amendment jurisprudence. Among these is the proposition that public parks are an especially important and protected forum for speech, even as compared to public streets. *See Hague*, 307 U.S. at 515; *Grossman*, 33 F.3d at 1204-05. Chief Judge Kozinski describes the Seattle Center as a "cultural achievement," "an enterprise," a "multi-use facility," and the "crown jewel of [Seattle's] civic enterprise." While accurate, these descriptions mask the Seattle Center's true identity: it is an 80-acre expanse of public land that includes twenty-three acres of outdoor, public park space. However unique the Seattle Center may be, it is, fundamentally, a public park. As such, regulations on speech within its boundaries warrant particularly close attention.

The dissenters also disregard the fundamental premise that "a law requiring a permit to engage in [individual] speech constitutes a dramatic departure from our national heritage and constitutional tradition," *Watchtower Bible*, 536 U.S. at 166, because "prior restraints on speech [like the City's permitting requirement] . . . are the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Such restraints bear a "heavy presumption" against their constitutionality. *Forsyth County*, 505 U.S. at 130. Without acknowledging the constitutionally suspect nature of prior restraints, the dissenters would uphold the permitting requirement on the weakest of rationales — i.e., that the requirement helps the City identify and punish rule breakers. As already discussed at length, the City need not implement a broadly applicable prior restraint to achieve these objectives. Allowing such an "intolerable infringement on First Amendment rights" therefore simply cannot be countenanced.

## VIII.    Conclusion

First Amendment protections are robust, yet at the same time fragile and precious. Often, government restrictions on speech seem perfectly reasonable at first glance, and the encroachment on expression forgivable in pursuit of convenience or good manners. But seventy years of law beginning with *Hague v. CIO*, has laid down the basic principle that there are a few government-owned areas — of which public parks are the preeminent example — in which the values underlying the First Amendment favor communication among citizens over merely reasonable speech restrictions, and require instead that any regulation of speech be targeted at real problems, and carefully calibrated to solve those problems. In other words, while some — among them, the dissenters in this case — might prefer a "Truman Show" version of pristine placidity in our public parks, our First Amendment jurisprudence rests on a very different vision.

The standards for valid regulation in traditional public fora are just moderately stringent, an intermediate level of scrutiny in the contemporary constitutional lingo. But the First Amendment interests advanced by the developed time, place, and manner jurisprudence does require that we apply that mid-level scrutiny with care, paying attention to the details of the regulation at issue, the state of the record, and the fit between the regulation and the governmental interest asserted. Having done so, we conclude that none of the challenged Rules qualify as reasonable time, place, or manner restrictions on the current record and that the district court's grant of summary judgment to Berger should be affirmed as to all but the location regulation, Rule F.5, and that the validity of Rule F.5 must be determined on remand, as the grant of summary judgment was improper.

AFFIRMED IN PART and REMANDED IN PART.

**Volume 2 of 2**

Chief Judge KOZINSKI, with whom Judges GOULD and TALLMAN join, dissenting:

Seattle Center is an astonishing cultural achievement. Just minutes from downtown on foot or by monorail, it is home to a dizzying array of entertainment venues, sporting events, festivals, educational and community programs, restaurants, museums and, of course, the world-famous Space Needle. The Center's website documents the close co-operation between the city government and the scores of private, professional and community organizations that provide over 10,000 attractions and events there every year. Having had its start as the 1962 World's Fair, the Center campus has maintained and enhanced its vibrancy over the intervening decades. In a square a little smaller than 6 blocks on a side, the Center is home to a professional sports team, PBS broadcast station, opera, ballet, Shakespeare Company, science center, IMAX theater, Experience Music Project (look it up), Science Fiction Hall of Fame, amusement park and countless other attractions. The Center is open from 7 a.m. to midnight every day, and this past year hosted 12 million visitors—roughly the population of Pennsylvania.

Operating an enterprise of this magnitude and complexity requires a good deal of effort and commitment. It also calls for some basic rules, to ensure the safety and convenience of the tens of thousands of people who visit the Center on an average day, and to preserve the atmosphere of hospitality and neighborliness that is the Center's guiding spirit.

The rules pertaining to street performers, which my colleagues discard like so much wilted lettuce, were adopted in response to specific problems: repeated disputes among performers about location, performances in places that could not accommodate the crowds gathered to watch them, and rude and overbearing demeanor of some performers towards the public. The following is from a declaration submitted by the city, which we must accept as true for purposes of summary judgment:

> Before the performer permit rules went into effect, . . . there were approximately 3 or 4 complaints by performers against other performers per week. If [plaintiff] Magic Mike was here, we could expect one or more from him and then one or more from whomever he was complaining about. . . . [T]here would be 1 complaint per week by a tenant of a facility in the Seattle Center . . . [and] 1 complaint per month by a member of the public against a performer. . . . The general complaints by performers against other performers would be "that is my spot and he can't be there" and/or "that performer is doing what I am doing and they won't move." . . . The general complaints by tenants against performers . . . concerned too much noise or blocking access . . . . [C]omplaints by members of the public generally concerned pushy or overbearing performers. . . . Emergency Service would normally receive 1 or 2 complaints per week regarding a performer trapping a captive audience.

The Center also experienced other problems: "Unregulated street performing had led to situations in which street performers had set up in areas that could not accommodate the crowds the performances sometimes gather. Street performers also sometimes set up too close to one another, creating conflicts between performers."

Seattle Center authorities found that they had no effective way to deal with these persistent problems:

> Before the permit system, the only recourse that Emergency Services had was to speak to the parties involved and ask performers to get along. We would ask anyone with loud or blocking performances to move or quiet down. Overbearing performers were spoken to and asked to leave if they did not change how they were doing their act. These requests did not reduce the number of complaints involving performers.

The new rules had the desired effect, bringing peace and order to what had been a chaotic and disruptive process:

> After the performer permit rules went into effect, Emergency Service rarely received any complaints regarding performers. In general, the permit system is welcomed by everyone. They know there are designated spaces for all different types of performances and that there are rules that everyone must follow. It has eliminated confrontation between performers. There are plenty of spots and they are not in the way of one another.

The majority here manages to strike down almost all of these rules without bothering to give Seattle an opportunity to present evidence justifying them. To that end, my colleagues deploy a number of techniques well designed for this purpose:

**1.** The majority finds the solution adopted by Seattle Center to be both too broad, maj. at 7765-67, and too narrow, *id.* at 7751, 7761-62, and so concludes that there's an "imperfect fit" between the rules and the goals the city seeks to achieve. *Id.* at 7761. But the Supreme Court has made it quite clear that time, place and manner regulations need not be perfectly tailored, and that a government body has considerable discre-

tion to fashion regulations as it thinks best: "The validity of such regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests." *United States* v. *Albertini*, 472 U.S. 675, 689 (1985). Rather, a regulation is valid "so long as [it] promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.*; *Ward* v. *Rock Against Racism*, 491 U.S. 781, 799 (1989).

Instead of settling for effective regulations, the majority demands perfection. But perfection is hard to find in rules written and applied by mortals. Once judges start looking for imperfections, that is pretty much the end of the story—and of the regulations. No rules written by man can withstand such persnickety scrutiny.

**2.** The majority also trots out the time-honored technique of declaring that the rules in question don't really solve the problems they're supposed to solve. Maj. at 7758-59. Which reminds me of the quip about economists greeting some item of news with the observation, "That may be so in practice, but is it true in theory?" My colleagues overlook evidence in the record that the rules have *actually* worked—the problems they were designed to solve went away as long as the rules were in effect. *See* p.7794 *supra*.

We are reviewing a grant of summary judgment against the Center; we must view the evidence in the light most favorable to it, and affirm only if there are no disputed issues of material fact. *Lopez* v. *Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). Instead, the majority makes its own findings, such as: the rules "do not promote [Seattle Center's] interests in any significant way," maj. at 7759; "do[ ] not aid in coordinating multiple uses" of Seattle Center, maj. at 7760; and that most street performances pose "no realistic coordination or traffic flow concerns," maj. at 7766. Who needs trials when we can find facts on appeal?

**3.** My colleagues also come up with solutions of their own, which they claim would better solve the problems. *See, e.g.*, maj. at 7764-65, 7768. But the majority's proffered solutions suffer from the same defects it finds in those adopted by Seattle Center, containing such fudge-words as "unwanted behavior" and "most sought-after locales." Maj. at 7762, 7765. The majority also suggests that the rules are unnecessary because the Center could solve the problems by "enforc[ing] an appropriately worded prohibition on aggressive behavior." Maj. at 7779; *see also id.* at 7762. Does the majority really mean to say that the Center can't have clear rules about obtaining permits and not trapping captive audiences, but it *can* kick out any street performer it deems "aggressive"?

Fortunately for my colleagues, *their* proposed solutions don't need to pass constitutional muster; they can just toss them out as supposedly superior alternatives. But if the city were gullible enough to follow these suggestions, my colleagues would find reasons to strike down the new rules in the next round of litigation. This artifice can be repeated many times, to the delight of plaintiff and the general enrichment of the legal profession.

The majority plays a shell game when it confidently declares that "[t]he City's asserted interest in coordinating multiple uses of the Center could also be achieved as effectively without the permitting requirement." Maj. at 7765. How is the city to achieve these objectives, in the majority's view? Why, it's by use of the designated locations rule that the majority fails to uphold elsewhere in its opinion. And if I had ham, I could have some very nice ham and eggs, if I had eggs. Sophistries such as these are cold comfort to those who have the actual responsibility for operating an enterprise the size and complexity of Seattle Center.

**4.** The majority overstates the problems that the rules supposedly cause for the street performers, and minimizes the problems that the street performers caused for the Center and

its patrons before the rules were instituted. For instance, the majority repeatedly describes the rules as "sweeping bans" on expressive activity. Maj. at 7779, 7784, 7786. In fact, no one is prevented from speaking; the rules merely regulate the time, place and manner of speech, and very lightly at that. Permits are issued on a non-discretionary, non-discriminatory basis, and the performers may conduct any performance they please, however often they want, at any time between 11:00 a.m. and 10:00 p.m., at any of sixteen designated locations. No one but the cantankerous Mr. Berger has a problem with the rules.

Citizens visiting the Center also have First Amendment rights: to enjoy the arts, music and programs offered there. Why should Berger be given a heckler's veto over the public's right to peaceful enjoyment of the park and that of other performers to attract an audience? Does the First Amendment really mean that citizens trying to enjoy a city park their tax dollars pay for must let themselves be browbeaten by Mr. Berger into giving him money for performances they don't wish to watch? As Justice Breyer recently observed, "cities use park space to further a variety of recreational, historical, educational, aesthetic, and other civic interests," and it is "perfectly proper" for cities to place "proportionate restriction[s]" on speech in order to preserve and coordinate these other interests. *Pleasant Grove City* v. *Summum*, 129 S. Ct. 1125, 1141 (2009) (Breyer, J., concurring).

**5.** The majority takes the concept of a facial challenge to extremes, conjuring up all manner of hypothetical people who could be affected by the regulations, even though there's no real possibility that the rules will be applied in such a counter-productive manner. *See, e.g.*, maj. at 7767 (guitar strummer at family picnic); *id.* (man whistling as he walks); *id.* at 7784 (person making "mildest remark" to someone standing in line). Plaintiffs can only raise the rights of others in an over-breadth challenge if there is "a realistic danger" that the challenged rule "will significantly compromise recognized First

Amendment protections of parties not before the Court." *Members of the City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U.S. 789, 801 (1994). The majority may come up with any number of hypothetical ways in which the regulations could be applied, but it makes no difference because guitar-strumming picnickers and itinerant whistlers face no *realistic* danger of being hassled by Seattle Center authorities.

The majority also faults Seattle Center for applying its rules to street performers who are not obnoxious. Maj. at 7765-66. But that's how rules operate: Two million travelers a day go through U.S. airport metal detectors in order to deter a few— very few—political terrorists. The Center's rules are designed to prevent abusive behavior, not punish those who are abusive. None of these other performers has objected to the rules and, according to the city, they are happy with them.

The irony is captured in footnote 15 of the majority opinion, which reveals that plaintiff was involved in 70 percent of the street performer complaints filed before adoption of the rules. It is fairly clear from the record that the rules were adopted largely to protect others—including other street performers—from Mr. Berger's overly aggressive behavior. It borders on chutzpah to invoke the rights of these other individuals, none of whom has seen fit to join Mr. Berger's suit, in striking down the rules designed to protect *them* from *him*.

**6.** The majority refuses to adopt the Center's proffered narrowing construction, which would limit the permit requirement to performances "aimed at attracting an audience," on the ground that it would make things worse, not better. Maj. at 7767-70. Yet the proffered narrowing avoids most of the majority's examples of supposed overbreadth. A man whistling as he walks, and a few friends singing for fun on their way to a concert, are clearly not engaged in a performance aimed at attracting an audience. Nor is the guitar-strummer at the family picnic; his only audience—his family—would be gathered around him regardless of his musical skills. Profes-

sional street performers are quite different, as anyone who has watched them can attest. They often wear costumes or distinctive clothes; they frequently carry props or musical instruments; and their performance is directed at the public and not at their companions. The majority makes it sound like it would take Sherlock Holmes working closely with Hercule Poirot to figure out who the street performers are, but elsewhere it makes just the opposite point: that the permit is unnecessary because the Center authorities know exactly who the street performers are. Maj. at 7763 n.14. The majority can't have it both ways.

"[E]very reasonable construction must be resorted to, in order to save a [rule] from unconstitutionality." *United States* v. *Buckland*, 289 F.3d 558, 564 (9th Cir. 2002) (quoting *Hooper* v. *California*, 155 U.S. 648, 657 (1895)); *see also Broadrick* v. *Oklahoma*, 413 U.S. 601, 613 (1973) ("Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged [rule].")*.* My colleagues instead reject every reasonable construction that might get in the way of finding the rules unconstitutional.

\* \* \*

"Public parks are often closely identified in the public mind with the government unit that owns the land. City parks—ranging from those in small towns, like Pioneer Park in Pleasant Grove City, to those in major metropolises, like Central Park in New York City—commonly play an important role in defining the identity that a city projects to its own residents and to the outside world." *Summum*, 129 S. Ct. at 1133-34. Seattle has a legitimate—indeed a vital—interest in maintaining the character of the multi-use facility that is the crown jewel of its civic enterprise. If the majority here is right, then Seattle and other municipalities hoping to use their parks to promote civic virtue, neighborliness, hospitality and the peaceful enjoyment of the arts cannot possibly draft a set of rules that will protect visitors, concessionaires and other art-

ists from overly aggressive street performers bent on increasing their own visibility and income by bullying those around them.

But the majority is not right. The rules adopted by Seattle Center are a measured and reasonable response to a real problem; none of them stifles speech in any meaningful way, and none is unconstitutional. There is little I can add to the excellent analysis in Judge Gould's opinion as to the specific rules struck down by the majority. Each of those rules is carefully tailored and narrowly drawn to deal with specific, identified problems that, in the judgment of those charged with operating Seattle Center, impaired the safety, convenience and enjoyment of visitors to the park. And, as Judge N.R. Smith explains, the performance-location rule is particularly well-suited to the city's legitimate objectives, while the objections to the rule—as to which a trial will now be required—are nothing but the personal preferences of the man who made the rules necessary in the first place.

It is unfortunate that such rules should be needed, as they seem largely designed to legislate civility. But Mr. Berger has been less than civil in his dealings with other performers and the public. The record, for example, references complaints against Berger for catcalling at a parent who refused to allow her children to watch his performance, bringing a child to tears for giving what Berger considered an insufficient donation and threatening and calling obscenities at a Center patron. In maintaining a hospitable campus, the Center management is surely entitled to deter such behavior by individuals profiting off its patrons.

Almost seventy years ago, the Supreme Court in *Cox* v. *New Hampshire*, 312 U.S. 569 (1941), unanimously upheld a state statute that required an advance permit for anyone wishing to exhibit any "theatrical or dramatic representation" or to conduct any "parade or procession upon any public street or way, and [any] open-air public meeting upon any ground

abutting thereon." *Id.* at 571. The Court's reasoning is as valid today as it was then:

> Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend.

*Id.* at 574. So long as the licensing board exercised its authority in a viewpoint-neutral, even-handed, consistent way, and the fee charged was reasonable, *id.* at 576-77, the permit requirement was constitutional, *id.* at 576:

> If a municipality has authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to time, place and manner in relation to the other proper uses of the streets. We find it impossible to say that the limited authority conferred by the licensing provisions of the statute in question as thus construed by the state court contravened any constitutional right.

*Cox* dealt with parades on public streets, but the Court reached the same result when an identically-worded city ordinance was applied to require a license to hold a religious meeting in a public park:

> The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or

> instruction. It is a *non sequitur* to say that First Amendment rights may not be regulated because they hold a preferred position in the hierarchy of the constitutional guarantees of the incidents of freedom. This Court has never so held and indeed has definitely indicated the contrary. It has indicated approval of reasonable nondiscriminatory regulation by governmental authority that preserves peace, order and tranquillity without deprivation of the First Amendment guarantees of free speech, press and the exercise of religion. When considering specifically the regulation of the use of public parks, this Court has taken the same position.

*Poulos* v. *New Hampshire*, 345 U.S. 395, 405-06 (1953). *Poulos* included an admonition that my colleagues would do well to heed: "There is no basis for saying that freedom and order are not compatible. That would be a decision of desperation. Regulation and suppression are not the same, either in purpose or result, and courts of justice can tell the difference." *Id.* at 408.

Twelve years later, in the other *Cox* case, Justice Goldberg, writing for the Court, emphasized the continued validity of *Cox* and *Poulos* and the importance of rules in maintaining the very concept of civil liberties:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the

public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.

. . . .

It is, of course, undisputed that appropriate, limited discretion, under properly drawn statutes or ordinances, concerning the time, place, duration, or manner of use of the streets for public assemblies may be vested in administrative officials, provided that such limited discretion is "exercised with 'uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination' . . . [and with] a 'systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways . . . .' " *Cox* v. *New Hampshire*, *supra*, at 576. *See Poulos* v. *New Hampshire*, *supra*.

*Cox* v. *Louisiana*, 379 U.S. 536, 554, 558 (1965) (alterations in original).

*Cox* v. *New Hampshire* and *Poulos* have never been overruled, so far as I know; indeed, the Court has built on them. *See, e.g.*, *Ward*, 491 U.S. 781 (upholding New York's sound-amplification guideline in Central Park); *Heffron* v. *Int'l Soc'y of Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) (state's interest in maintaining the orderly movement of the crowd at annual state fair sufficient to support requirement that religious group confine its distribution, sales and solicitation activities to a fixed location); *Taxpayers for Vincent*, 466 U.S. 789 ("municipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression").

The majority turns up its nose at *Cox* and *Poulos*, on the ground that "both cases preceded the development by the Supreme Court of specific time, place and manner standards," maj. at 7760-61, but the Supreme Court recently relied on them in *Thomas* v. *Chicago Park District*, 534 U.S. 316 (2002), where it (again unanimously) upheld a licensing requirement for any activity in a public park that exceeded 50 participants. In so doing, the Court reiterated the distinction between permits designed to censor and those designed to regulate competing uses in public areas:

> "[T]he [permit] required is not the kind of prepubli-cation license deemed a denial of liberty since the time of John Milton but a ministerial, police routine for adjusting the rights of citizens so that the oppor-tunity for effective freedom of speech may be pre-served." *Poulos* v. *New Hampshire*. Regulations of the use of a public forum that ensure the safety and convenience of the people are not "inconsistent with civil liberties but . . . [are] one of the means of safe-guarding the good order upon which [civil liberties] ultimately depend." *Cox* v. *New Hampshire*.

*Id.* at 323 (citations omitted, alterations in original). The Court didn't ask why the city couldn't let all gatherings go forward, and then break up those that got out of hand. Rather, the Court accepted the city's estimate that a gathering of more than 50 people could cause problems and upheld the permit requirement.

Unlike the circuit opinions on which my colleagues rely, these Supreme Court cases—an unbroken line spanning more than six decades—are controlling authority, and we are bound to follow them. Applying these cases to the facts before us, I note that Seattle Center is the type of public gathering place that the Court dealt with in *Poulos*, *Ward*, *Heffron*, *Thomas* and *Summum*. The concerns that gave rise to the permit requirement and other regulations here are much the same as

in those cases, and in *Cox* v. *New Hampshire* and *Vincent* as well. Despite the majority's obvious desire to reach the opposite conclusion, maj. at 7751, 7759 n.9, we are bound to assume that the permit requirement has been administered in a neutral fashion and does not give Seattle Center authorities undue discretion, as Berger has never contended otherwise.

To me, this makes the case before us materially indistinguishable from these Supreme Court cases. The only significant differences cut sharply in favor of upholding the permit requirement. First, the rules here are considerably less restrictive. As the majority recognizes, "the permitting schemes at issue in *Cox* and *Poulos* both required applicants to 'specify the day and hour' that they planned to hold their parade or public meeting." Maj. at 7760. Here, a single permit entitles the holder to perform at any time he wishes between 11:00 a.m. and 10:00 p.m., for as long as he wishes, in any of the designated locations, for an entire year. The majority somehow finds that this weighs *against* the Center, taking it as proof that the permits do not "further the government's interest in coordinating multiple uses of limited public space." *Id.* This is very strange reasoning. If the Center believes that it doesn't need a more restrictive permit to serve its ends, who are we to say that the restrictions are inadequate? The majority's clumsy effort to distinguish away the *Cox* line of cases stands the concept of narrow tailoring on its head.

The majority also criticizes the permit requirement because, unlike in *Thomas*, it's not limited to performances attracting a certain minimum audience. Maj. at 7768, 7787. But the majority overlooks *Poulos* v. *New Hampshire*, where the Court upheld a permit requirement for groups of any size wishing to hold an "open air public meeting" in a city park. 345 U.S. at 397 n.2, 402-08; *see also Cox* v. *New Hampshire*, 312 U.S. at 571-72, 576. *Thomas*, in turn, relied on *Poulos* and *Cox*. 534 U.S. at 323.

The majority's distinction is nonsensical, in any event. When a permit is required for public meetings, as in *Thomas*

and the other cases the majority relies on, the organizers can be expected to know, based on the degree of public interest, advertising and outreach, how large a group is likely to show up. The license the Center issues here is quite different: It is good for an entire year and entitles the bearer to perform hundreds or even thousands of times. The size of the crowd on any given day, at any particular hour, may be hard to predict, but it doesn't matter, as long as the Center reasonably believes that on *some* days, at *some* hours, a sufficiently large crowd may gather to impair the efficient operation of the Center.

It's ridiculous to suggest that performers may be required to obtain permits if the crowd that gathers to see them is of a certain size, but not if it is not. How is anyone to know in advance? Depending on the performer's popularity, the day of the week, the hour of the day and the availability of other attractions, a larger or smaller crowd may gather. What is the performer to do, if he doesn't have a permit? Must he count the crowd to make sure it doesn't exceed the limit and ask some to leave if he realizes there are too many? Should he stop the performance until the crowd disbands? When dealing with a performer who may give 20 or 30 performances a day, 20 or 25 days out of every month, using a numerical limit on the size of the audience, as the majority envisions, just doesn't make any sense; it is certainly not constitutionally required. The city can reasonably presume that when people engage in activities designed to gather a crowd, they will get a crowd often enough to render the activity the legitimate object of regulation.

The simple fact the majority overlooks is that street performers like Berger are not merely citizens who wish to use the park as a forum for public expression or religious worship on an occasional basis; they are operating a business and earning a living from these activities. They are repeat players—a continuing presence at the Center—taking advantage of the crowds generated by Seattle Center's organization and indus-

try to promote their own economic well-being. To be sure, the business that these performers engage in does involve communicating with the public, and can be characterized as art or at least craft, so it deserves First Amendment protection. But there are many businesses whose object is communicating with the public: theaters, cinemas, art galleries, record shops, night clubs, advertising agencies, investment advisors—the list is long and varied. No one has ever suggested that theaters, say, are exempt from fire laws, building codes, labor-relations regulations, taxes or the multitude of other non-content related laws that are applicable to any other business. The First Amendment simply doesn't sweep so far. *See, e.g.*, *One World One Family Now* v. *City & County of Honolulu*, 76 F.3d 1009 (9th Cir. 1996) (upholding a ban on sidewalk sale of message-bearing t-shirts).

Berger and other street performers are actors without a theater, circus performers without a tent. Not having a fixed facility, they perform in open spaces where people gather in the expectation that those who watch them will reward them. And this is not an idle hope: Rewarding street performers whose act one watches is a bit like tipping at hotels and restaurants—a social obligation that is not legally enforceable but many people feel bound to honor.

The commercial aspects of the street performer trade, which my colleagues overlook, set up the dynamics that have given Seattle Center cause for concern. A street performer's income depends on the crowd he is able to draw, so location is a very important issue—hence the strife about who gets to perform at the choicest spots. The economic incentive also can lead to aggressive solicitation of patrons, and rude remarks when patrons give what the performer believes is an insufficient donation. The economic incentive may lead street performers to find captive audiences—say, people standing in line—and start performing near them, hoping to guilt them into making a donation even if they have no particular interest in the performance.

Social conventions often create very strong obligations—such as when one leaves a sizable tip after receiving lousy table service to avoid an unpleasant reaction from the waiter—and people standing in line who have had the "benefit" of a street performance that they did not seek out or enjoy may feel pressured to cast down a dollar or two, just so others won't consider them to be moochers. The patrons may nevertheless feel put upon, and their Center experience may be tainted by having been buffaloed into this transaction.

The Supreme Court in *Summum* drew a distinction between traditional public speakers who, "no matter how long-winded, eventually come to the end of their remarks," 129 S. Ct. at 1137, and monuments in public parks, which "endure." *Id.* Because monuments are a permanent fixture of the facility, they "monopolize the use of the land on which they stand and interfere permanently with other uses of public space." *Id.* Street performers, like plaintiff here, fall somewhere in between these two extremes: They do go home at the end of the day (like occasional public speakers), but they come back the next day and the day after that, on a permanent or semi-permanent basis. Each performance may attract a relatively small audience compared to a speech or a rally, but each performer will be constantly gathering crowds. A facility like Seattle Center can't accommodate an unlimited number of such performers; if there are too many at the same time, or at the same location, they begin to "interfere permanently with other uses of public space." *Id.* Cities therefore have a far greater interest in regulating the activities of permanent street performers than occasional political or religious speakers.

If, as the Supreme Court has held, municipalities have the authority to regulate eleemosynary and volunteer activities—even bible classes—in public spaces, to preserve the safety and convenience of individuals using the public facility, then surely they have the authority to regulate street performers, who are operating small businesses within a complex that the city maintains and nurtures. My colleagues in the majority

eschew this obvious conclusion by means of two arguments, neither particularly persuasive.

First, my colleagues take the view that the permit requirement is invalid because it serves no legitimate purpose, but they are mistaken, as Judge Smith persuasively demonstrates in his separate opinion. Smith at 7839-40. I note, to begin with, that when the Supreme Court *has* upheld permit requirements, it has not demanded a particularly rigorous, or any, justification for them, relying instead on the obvious and common-sense reasons to require a permit. In *Cox* v. *New Hampshire*, the court merely referred to "[t]he obvious advantage of requiring application for a permit" with no suggestion that this advantage had to be proven up to any degree of certainty. 312 US. at 576. In *Poulos* and *Thomas*, the Court made no reference whatsoever to the efficacy of the permit requirement. In all three cases, the Court's focus was on whether the permit was administered in a content-neutral, objective and non-discriminatory fashion and, having satisfied itself that it was, the Court did not consider efficacy to be an independent constitutional requirement. *See also Heffron*, 452 U.S. at 650-53 (not questioning efficacy of requirement that religious group operate from a fixed location at state fair).

It's thus not clear that, when considering a licensing scheme for holding a public event such as a bible study, performance or parade in a place where there are competing or inconsistent uses, the licensing authority has to make a very convincing showing—or any showing at all—that the license serves the desired purpose. We can assume, as has the Supreme Court on more than one occasion, that the city wouldn't devote the time and resources to administering such a scheme unless it served to reconcile the various competing uses.

But if a purpose there need be, it is pretty obvious what it is here: To deter unruly behavior on the part of street performers by denying them the cover of anonymity, and to give Seat-

tle Center authorities a means of holding them accountable when they do misbehave. To start with the obvious, requiring a street performer to obtain a permit gives Seattle Center authorities an address where they can write to him if issues arise; there is such a letter, dated October 3, 2003, in the record. Without such an address, how do the authorities proceed when they want to give the performer notice of an alleged violation? How do they notify him of their decision?

Requiring a street performer to have a license and display a badge, which can be suspended or revoked, also facilitates the imposition of discipline. If the performer is found guilty of a violation, the badge can be taken away for the duration of any suspension, or permanently, and security officers can then enforce the performance ban by stopping performances by anyone who does not display a badge. This eliminates the need to check records or settle disputes about whether or not a suspension is in effect.

Requiring a badge also makes it more likely that individuals aggrieved by the performer's misconduct will be willing and able to report it. The badge informs the public that the performer can be reported to Seattle Center if he misbehaves. Members of the public are far likelier to lodge a complaint against someone with an official badge than someone who appears to be an independent private party. The badge in this situation serves the same purpose as badges and name-tags worn by law enforcement officers, supermarket clerks and hotel staff—it is a way of making misconduct less likely by significantly increasing the risk that it will be reported.

The requirement that the performer provide a name and display a badge also avoids confusion and misunderstandings. My colleagues in the majority may think it's perfectly OK to identify performers by such colloquial descriptions as "the hula-hooping magician" or "the puppet guy," maj. at 7763 n.14, but that's no way to run a monorail. What if the puppet guy is hit with a suspension and claims that the culprit was

really the marionette guy, or that the hula-hooping magician was really the balloon-animal magician? The complainants in such cases may be tourists from another state, long gone from the scene before the dispute can be resolved. A badge with a name and picture avoids such misunderstandings and makes it far less likely that street performers will misbehave—which, of course, is the ultimate objective.

The Center could, as the majority suggests in places, call the police when street performers seriously misbehave, but it is hardly conducive to maintaining a pleasant atmosphere in the park to have the man in the clown suit hauled off in handcuffs. And how many people want to spend their vacation getting into a head-to-head confrontation with someone obnoxious, or tracking down security personnel and filling out police reports? Most people who are victims of inappropriate or rude behavior register their protest with their feet: They walk away from the place of the unpleasantness and don't come back. And they tell their friends and neighbors in Pittsburgh and Wilkes-Barre that this is not where they should spend their vacation dollars.

And, of course, much inappropriate behavior, like that plaintiff is accused of, *see* p.7800 *supra*, falls far short of a criminal offense. I doubt that the Center can have someone arrested for calling a visitor a "M***** F*****"—as plaintiff is charged with doing. The majority's suggestion that police can demand identification and an address from misbehaving street performers, maj. at 7764, suffers from the same problem: Police can demand identification only when they have "reasonable suspicion to believe the suspect was involved in criminal activity," not when they believe that someone's been obnoxious and disruptive. *Hiibel* v. *Sixth Judicial Dist. Ct. of Nev.,* 542 U.S. 177, 184 (2004). Police who tried to force Mr. Berger to identify himself when he throws one of his hissy fits would soon find themselves as defendants in a civil rights lawsuit.

And yet, Seattle Center "play[s] an important role in defining the identity that [the] city projects to its own residents and to the outside world." *Summum*, 129 S. Ct. at 1134. Misbehavior by performers who are a constant presence at the Center is a disaster in the making for an enterprise whose mission it is "to delight and inspire the human spirit in each person and bring us together as a rich and varied community." http://www.seattlecenter.com/information/default.asp. It may be true that public parks need not reflect "a 'Truman Show' version of pristine placidity," maj. at 7790, but the First Amendment surely doesn't require that our parks resemble *The Aristocrats* either.

Operating a huge enterprise like Seattle Center, one that caters to the needs and wants of tens of thousands of visitors on an average day, is an enormously difficult and complex task. Maintaining the goodwill of the public and support of the community over the decades is at the heart of that success. When the people responsible for that enterprise tell us that a content-neutral, non-discriminatory permitting requirement has been effective in solving a serious problem that has been eroding that goodwill, it takes considerable hubris for judges to say they know better.

The second theory under which the majority finds fault with the permit requirement is the supposed impermissibility of "single-speaker registration requirements." Maj. at 7752-57. This is a curious theory, because none of the cases on which my colleagues rely makes any reference to the number of speakers involved, and certainly none mentions the size of the group as being dispositive. All of the cases on which the majority relies were solicitation cases; one can assume that the group of speakers involved would have been small by the nature of the activity. But the theories under which the Court struck down the permit requirements in those cases were varied and had nothing to do with the size of the group.

In *Cantwell* v. *Connecticut*, 310 U.S. 296 (1940), for example, the Court struck down a state statute which forbade the

solicitation of money for religious causes unless the solicitors obtained a certificate from a government official, who was required to determine that the cause in question was, indeed, religious. The Court struck down the requirement because the statute authorized a government official "to withhold his approval if he determines that the cause is not a religious one. Such a censorship of religion as the means of determining its right to survive is a denial of liberty protected by the First Amendment . . . ." 310 U.S. at 305. The size of the soliciting group was not even mentioned; indeed, the Court made it clear that "general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, is not open to any constitutional objection, even though the collection be for a religious purpose." *Id. Cantwell* undermines rather than supports the majority's theory.

This is true of each of the other cases the majority draws upon for its theory, including *Watchtower Bible & Tract Society of N.Y., Inc.* v. *Village of Stratton*, 536 U.S. 150 (2002), on which the majority places the heaviest reliance. *Watchtower* was a case involving door-to-door canvassing by a religious group. In striking down a requirement that the canvassers first obtain a permit from the town authorities, the Court pointed to a number of factors, none of which had anything to do with the number of canvassers, among them "the historical importance of door-to-door canvassing and pamphleteering as vehicles for the dissemination of ideas," *id.* at 162; that the canvassers were not engaged in the solicitation of funds, *id.* at 165; the legitimate interest of some canvassers in anonymity, *id.* at 166; that the advance permit requirement inhibits some spontaneous speech, *id.* at 167; and that residents could ward off all canvassers by posting legally enforceable "no solicitation" signs, which petitioners promised to respect, *id.* at 168. None of these factors is even remotely applicable to our case: Balloon animals and magic tricks don't feature the dissemination of ideas, street performers do solicit funds, sometimes quite aggressively, and there

is no legally enforceable way for patrons to keep Berger from trying to lure their children to come watch him or prevent him from insulting them when they resist. Finally, despite the majority's repeated assertions otherwise, maj. at 7754 n.5, 7763-64, street performers have little interest in anonymity. Hula-hooping magicians and puppeteers are hardly advocates for "unpopular causes," *Watchtower Bible*, 536 U.S. at 167; they are entertainers, and gaining public recognition will only help their businesses. *Watchtower* and our case have about as much in common as bananas and boomerangs.

The most one can say about the cases that form the backbone of the majority's analysis is that the Court has been reluctant to approve restrictions on the rights of individuals and small groups to engage in discourse with other individuals and small groups—the kind of interactions that always arise in solicitation, canvassing or hand-billing cases. This is not really surprising, because individual-to-individual and small group-to-small group interactions generally do not pose the sort of problems that time, place and manner rules are designed to deal with. Moreover, they are very much like the interactions almost everyone has during the course of his daily life—striking up conversations with others on the street, in his neighborhood or in public places. It may thus be fair to infer a presumption against laws prohibiting such small-group interactions.

But it is a wholly different matter to derive some sort of rule that prohibits—or strongly discourages—regulation of speech by a single individual, regardless of the size of his expected audience or the disruption he may cause. Nothing in the Supreme Court's caselaw supports any such proposition, and there is much to refute it. Take the following examples, which strike me as so obvious that no case citation is necessary:

- A municipality prohibits people from falsely yelling fire in a crowded theater. Is there a constitu-

tional exception for a single individual? I don't think so. Why? Because the effect of the single speaker on the crowd of people thrown into panic can be disastrous.

- A famous civil rights leader plans to hold a speech at the Lincoln Memorial; the speech is eagerly anticipated and half a million or more people are expected to attend. According to the majority's flawed theory, the city of Washington could not require the speaker to register in advance, or give the city notice that a large audience is expected. Indeed, any number of independent single speakers would be entitled to show up unannounced and give their speeches at the very same time and place. There's nothing in the Supreme Court's caselaw that remotely supports that proposition.

- Yo-Yo Ma is probably the greatest cellist of our time, and a free concert for the benefit of the people of Los Angeles would surely be greeted with enthusiasm. But if Mr. Ma wanted to set up his cello in the third lane of the West-bound Santa Monica Freeway adjacent to the Robertson exit, I have no doubt that the California Highway Patrol could engage in prior restraint by preventing him. That Yo-Yo Ma is a single artist of remarkable talent would have no effect whatsoever on that result.

- Mr. Nez, who lives in Pasadena, wants to hold a parade celebrating the Festival of Noses. And he wants to follow the route that is followed every year by another parade with a very similar name —starting north on Orange Grove Avenue near California, then turning east on Colorado for about 5 miles. Unfortunately for Mr. Nez, no one

else shares his enthusiasm, so he decides to hold a one-man parade, carrying a giant paper mache replica of Jimmy Durante's head. Having read the majority's opinion, he believes that he needs no parade permit since he is, after all, a single performer. So, about 9 a.m. on January 2, he dons a top hat and tails, holds high the effigy of The Schnozz and starts walking north on Orange Grove straddling the double yellow line. My guess is that the Pasadena police would pick him up and give him a jaywalking ticket (or worse) long before he got to Colorado. His First Amendment defense would get about as far as his parade.

I could go on, but these "silly" examples, maj. at 7788, are enough to put to rest the fatuous notion that single speakers are entitled to favorable treatment under the First Amendment. Rather, the decision always hinges on the interaction between the speaker and the activities affected by him or his speech. If you go to the desert, you can shout "fire" as loudly and as often as you wish. You can bring a thousand friends with you and all of you can shout "fire" day and night, in unison, in sequence or to the rhythm of Bolero. You can sing about cesium and recite poems about arson; you can arrange a parade celebrating fire, or noses or whatever you wish. So long as there's no one to be bothered, there's little the government can or should be able to do to stop you. But if you are in the city, if you are at a mall, if you are at a stadium where thousands of people are crowding onto moving escalators, then we can reasonably expect you to be much more circumspect about what you say and where you say it, because the effect on others may be disastrous.

Context is everything in First Amendment analysis and the majority's single-speaker rule fails because it doesn't take context into account. Even if, as the majority suggests in places, its single-speaker rule would only apply to speakers

who attract audiences of less than 75 or less than 100, maj. at 7766, 7787, any such rigid numerical rule will fail because it makes no account for the performance's effect on others. The performances by Mr. Ma and Mr. Nez, for instance, would be seriously disruptive whether they gathered a large audience or no audience at all. In deciding whether Seattle Center can require advance registration of street performers, it matters not at all whether they involve a single performer, like plaintiff, two jugglers or twelve lords-a-leaping. What matters is that street performers are out for donations, and donations increase with the size of the crowd the performers attract. Thus, attracting crowds is not merely an unforeseen byproduct of street performing, it is its sine qua non: A street performer who never gathers an audience would give up the pursuit very quickly.

Crowds, of course, are worrisome when dealing with large groups of people moving through a restricted area like Seattle Center and thus are a legitimate thing for the authorities to be concerned about. They can also legitimately be concerned about how performers interact with the crowds they attract, and the effect they have on the public goodwill which is, after all, the lifeblood of the Center's mission. The regulations the Center put into place to address this problem are sensible and measured. There is no evidence whatsoever that the rules have been applied in an oppressive or discriminatory manner, that they have been enforced against teenagers strumming their guitars at family picnics, or against people whistling while they walk, or against political canvassers.

All of these are figments of the judicial imagination—a fertile imagination, to be sure, but woefully out of touch with the realities of running a complex enterprise which brings joy to millions of people a year. By focusing on the largely imaginary First Amendment injuries which might be suffered by largely imaginary people, my colleagues impair the First Amendment rights of the millions of actual people who come to Seattle Center to see, to hear, to learn, to enjoy, without

being subjected to the stress of dealing with overly-aggressive street performers who shout obscenities and send young children off crying. There are times when the best thing judges can do is to butt out; this is surely one of them.

---

GOULD, Circuit Judge, with whom Chief Judge Kozinski and Judge Tallman join, dissenting:

I dissent from the majority's invalidation of the permit and badge requirements, for the reasons stated by my colleague Chief Judge Kozinski in his dissent. The permit scheme is a reasonable response to the City of Seattle's need for order to maintain the efficacy and desirability of Seattle Center for its citizenry and visitors. I write separately to explain my disagreement with the majority's conclusions relating to the Seattle Center Rules regarding required performance locations, the allowing of only passive solicitation, and the preclusion of speech activities including performances within thirty feet of captive audiences engaging in other events at Seattle Center. These Rules are reasonable time, place, and manner restrictions on speech because they are content-neutral restrictions that are narrowly tailored and leave open ample alternative means of communication. I conclude that separate attention to each of these restraints is warranted.

In Section I, I first comment on the substantial value of street performance, while acknowledging the City's superordinate need to regulate it in the interest of order. In Section II, I explain why the performance location rule is a reasonable time, place, and manner restriction that should be upheld and why Berger's evidence stating otherwise is insufficient to preclude summary judgment in favor of the City. In Section III, I explain why the passive solicitation rule is also a reasonable restraint on the manner of solicitation and should be upheld. In Section IV, I explain why Seattle's rule protecting captive

audiences should also be upheld in light of the special multi-purpose nature of Seattle Center.

By invalidating the City of Seattle's reasonable time, place, and manner restraints on solicitation and performances to captive audiences, and by generating a fictitious fact issue on performance location, the majority utterly fails to give due weight to the valid interests of the City of Seattle in protecting a smoothly running Seattle Center. These include the City's interests in "traffic control" when competing street performers want to use the same place for their expression, and the regulation of street performers who communicate at Seattle Center in circumstances that may interfere with the Center's other activities. *See* Thomas I. Emerson, *Toward a General Theory of the First Amendment*, 72 YALE L.J. 877, 946-47 (1963) (stating that by regulating "traffic control" a government can "maintain orderly expression and thereby promote freedom of expression"). The majority's holding impairs the value of Seattle Center to Seattle's residents, to visitors from worldwide locations, and to the organizations that make Seattle Center their home. Its holding is not needed to protect the free and full exchange of ideas that helps to keep our society vital. Therefore, I respectfully dissent, and elaborate my views.

## I

The value of the speech from street performers impacted by the City's permit scheme is significant, but Rules F.1 and F.2 are nonetheless constitutional because of the need of the City to maintain order at this gem of a civic attraction. The City's interests are well articulated by Chief Judge Kozinski, but I will expand on the speech value of the street performances: Speech in the form of music, drama, or performance has played a vital role in our society and deserves First Amendment protection. Some of our culture's most valued written works originated as spoken performances. For example, what we know now as Homer's *Iliad* and *Odyssey* likely were originally preserved through verbal performances. *See* Mark W.

Edward, *Homer and the Oral Tradition*, 18/1 ORAL TRADITION 65 (2003) ("By now the facts about the nature of the oral features . . . in Homer are well known and (on the whole) not controversial."); *see generally* Bruce Louden, THE ILIAD: STRUCTURE, MYTH and MEANING (Johns Hopkins University Press 1996). Music likewise has helped to develop our Western civilization. *See, e.g.*, Paul Henry Lang, MUSIC IN WESTERN CIVILIZATION xix (W.W. Norton & Co. 1997) ("Every civilization is a synthesis of man's conquest of life. Art is the ultimate symbol of this conquest, the utmost unity man can achieve."). Even if our society today does not always hold street performers in the highest of esteem, these performers continue the tradition of transmitting culture, as done by the traveling minstrels, talebearers, and acting troupes that have helped to develop what we consider our Western culture. It would be easy to underestimate the value provided by these performers, or the accompanying need for First Amendment protection, if we only looked at a single performer and especially if we had little affinity for that person's performance. However, that such performances are possible in the aggregate bestows value on a society.

The City's permit system and related regulatory restraints may require some individuals wishing to express themselves through spontaneous performance to wait until they have gained a permit and channeled their performance into a permitted location. It is true that the Supreme Court, while reviewing a restraint on private solicitation, has criticized a permit requirement in part because "a significant amount of spontaneous speech" was "effectively banned" by that requirement. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 167 (2002). It might also be conceded that delaying speech takes some toll on the speaker. *See* Vincent Blasi, *Toward a Theory of Prior Restraint: The Central Linkage*, 66 MINN. L. REV. 11, 82 (1981) ("[E]ven short delays take from speakers the power to determine precisely when to disseminate their communications. When government possesses the power to delay communications that it

cannot suppress, speakers cannot be said truly to control, in the sense required for autonomy, their own communicative endeavors."). Nonetheless, the Supreme Court has upheld permit requirements that seek to regulate traffic control and maintain order. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316 (2002) (upholding permit requirement for large events in public parks); *Cox v. New Hampshire*, 312 U.S. 569 (1941) (upholding permit requirement for parades on public streets). Every permit requirement deters some spontaneous speech. That the Supreme Court has routinely allowed permit schemes outside of the solicitation and small-group interaction contexts shows that a harm to spontaneous speech is not enough to render a permit requirement unconstitutional. Wandering musicians, poets, actors, or other street performers who come to Seattle and wish to perform a protest song or reading or drama can be required to delay their speech until they comply with the reasonable rules that the City of Seattle has established for public performance in its important Seattle Center venue.

The value to society of informal speech presented through performance of music, poetry, and drama is great. It can keep us alert and open to societal criticisms of practices that require change. At the same time, for the reasons well stated by Chief Judge Kozinski, the need for and value of a permitting system regulating such speakers is superordinate in this context because of the unique nature of Seattle Center. Indeed, the speakers themselves benefit from the maintenance of an orderly system that deters interference with their performances and disputes over desirable performing locations. It would be nice to think that all of the important interests of the City of Seattle can be accommodated by reasonable time, place, and manner restrictions, but it is a reckless gamble to so conclude and I cannot say that the City should not rationally be able to protect itself, and its citizens and visitors, through the permit process. Unless and until the Supreme Court stands opposed to such permitting for such a unique

venue, I conclude that a permit process should be within the City's arsenal of tools for managing order at Seattle Center.

## II

I next address the performance location rule, Seattle Center Rule F.5, which I view as a reasonable time, place, and manner restraint on which the majority's analysis goes astray. As the Supreme Court declared in *Ward v. Rock Against Racism*, the government may impose reasonable time, place, and manner restrictions on speech. These restrictions must be "justified without reference to the content of the regulated speech." They must be "narrowly tailored to serve a significant governmental interest." And they must "leave open ample alternative channels for communication." *Ward*, 491 U.S. 781, 791 (1989). For the performance location rule, the key issues arising under this formulation of doctrine are whether the restraint permits sufficient alternate means of communication, and whether it is narrowly tailored to meet its ends without gratuitously impeding speech.

Rule F.5 is constitutional. If it were to decide otherwise, the majority would impose an improvident burden on cities seeking to regulate speech locations in the future. It would go far to read "place" out of the general accommodation for reasonable time, place, and manner restrictions. What we should be asking ourselves here are fundamental questions about how Rule F.5 affects speech. It is, in my view, a paradigm restraint on location. It funnels performance speech into sixteen locations near the most popular Seattle Center attractions, where the performers will be readily visible but should not impair Seattle Center's ability to welcome guests, both resident and tourist, who want to sample its attractions. The performance location rule does not in any way say what performers can or cannot say or do, it merely ensures they will present their speech in locations that do not unduly impede the commerce of the City. Thus alternative means of communication are ample and secured. At the same time, I conclude the restraint

is sufficiently and narrowly tailored. It does not gratuitously impede any speech, it just channels it to a convenient place to accommodate both the speaker's interest and the interests of Seattle Center patrons. What is wrong with this? Nothing, under any balanced First Amendment analysis.

The City has established that without the performance location rule there would be a likelihood of conflict and chaos that will interfere with Seattle Center's important functions. The undisputed evidence in the record shows that before the location restrictions were imposed street performers often set up in close proximity to one another, leading to territorial disputes and altercations. Street performers also set up in locations that could not accommodate the gathering audience or that blocked pedestrian access. The City received weekly complaints about pedestrian access problems. This evidence satisfies our First Amendment requirement "that municipalities provide tangible evidence that speech-restrictive regulations are necessary to advance the proffered interest in public safety." *Menotti v. City of Seattle*, 409 F.3d 1113, 1131 (9th Cir. 2005) (quotation omitted). The performance location rule would help eliminate confrontations between street performers over location and would ensure that pedestrian walkways remain clear.[1] *Cf. Cox v. Louisiana*, 379 U.S. 536, 554-55 (1965) (stating that "[g]overnmental authorities have the duty and responsibility to keep their streets open and available for movement" and that "[a] restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot

---

[1]Thus the performance location rule serves both of the traffic control interests identified by Professor Emerson. Emerson identifies two cases in which the government has a legitimate interest in traffic control. One situation occurs "where two or more groups desire to hold a parade, demonstration or meeting in the same place," and the other "becomes necessary in situations where a group wishes to engage in some form of communication at a place which will interfere with the normal flow of traffic or the activities of other persons engaged in other affairs." *See* Emerson, 72 YALE L.J. at 947.

be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection"). Accordingly, the Rule meets the Supreme Court's narrow tailoring requirement that a "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).[2]

Contrary to the majority's view that there are unresolved fact issues on this matter, the City has shown that the performance location rule provides ample alternative channels for communication. All that is needed to satisfy the "ample alternatives" test is "that the government refrain from denying a reasonable opportunity for communication." *Menotti*, 409 F.3d at 1141 (quotation omitted). The City has met its burden. The record includes a map of the performance locations, which shows that the locations are adjacent to major pedestrian thoroughfares and are situated near all of the most popular Seattle Center attractions, including the Space Needle, KeyArena, Pacific Science Center, and the Experience Music Project. In response, Berger makes two unsupported statements that some locations are far from walkways or are occasionally blocked by equipment. Berger does not identify the specific locations to which he objects, and he does not directly dispute the authenticity of the City's map. "A sum-

---

[2]In its attempt to avoid summary judgment favoring the City on this Rule, the majority adopts a counterintuitive conception of what realistically is meant by the term "street performer." As the majority sees it, this term would include Gene Kelly Singing in the Rain or any person who whistled while they worked or whistled while they walked. I agree with Chief Judge Kozinski that there is no realistic danger the City will interpret its definition so broadly and that the City's limiting construction cures any perceived danger. The record generated in the process of adopting the Rules shows what the City was aiming at, which certainly wasn't an impromptu version of Singing in the Rain or the casual whistler. The language used by the City in Rule F.5 does not reasonably contemplate such a broad definition, and so the majority's argument about an overbroad and thus constitutionally invalid definition of "street performer" should not be credited.

mary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data," *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), but that is precisely all that Berger provides. The majority nonetheless recites that Berger's conclusory evidence is sufficient to defeat summary judgment and even creates a reasonable inference of unconstitutionality. Its conclusion is inconsistent with our summary judgment standard as it has been explained by the United States Supreme Court and elaborated in our precedent. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 880 (1990) (stating that although Fed. R. Civ. P. 56(e) allows a party to defeat summary judgment through affidavits that establish a genuine factual issue, "[t]he object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

Rule F.5 allows for ample alternative channels of communication even if we accept Berger's factual allegations as true. I agree with the portion of Judge N.R. Smith's analysis that explains why under our precedent and that of the Supreme Court, Berger's conclusory allegations do not create any material fact dispute that would preclude summary judgment in favor of the City. The City presented uncontested evidence that even at peak times fewer than half of the designated performance locations are in use. Therefore, even if some of the locations are undesirable, Berger has provided no evidence that the location restrictions preclude the entire medium of street performance or deny street performers a "reasonable opportunity for communication." *Menotti*, 409 F.3d at 1141 (quotation omitted); *see also Colacurcio v. City of Kent*, 163 F.3d 545, 555 (9th Cir. 1998) ("The Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting."). I conclude that the City is entitled to a summary judgment upholding the performance location rule. The

majority's remand for factual determination on alternative channels of communications is unnecessary and incorrect.

## III

I next address the passive solicitation rule. Rule F.3.a provides that no street performer "shall actively solicit donations, for example by live or recorded word of mouth, gesture, mechanical devices, or second parties." The Rule does permit passive solicitation by allowing performers to provide a receptacle for donations and display "a written sign that informs the public that such donations are sought." By misconstruing the passive solicitation rule as being "content-based," the majority again misapplies the general rule permitting reasonable, time, place, and manner restrictions, this time reading "manner" out of the permitted restraints.

The ban on active solicitation is neutral in content. Applying the Supreme Court's "principal inquiry in determining content neutrality," I conclude that the City did not adopt its passive solicitation rule "because of disagreement with the message [soliciting speech] conveys." *Ward*, 491 U.S. at 791. The Rule does not depend on the content of the solicitation, there are no favored organizations or persons—no street performer advancing any cause can solicit funds from Seattle Center patrons in an active way, none can demand money verbally. Street performers cannot implore people to give them money, but they can post a passive sign alerting their listeners that they would appreciate a contribution, and providing a proper receptacle. In sum, there is no evidence that the City disagrees with the views of Seattle Center street performers, nor is the City stifling messages of solicitation completely. If this is not a reasonable manner restriction, then probably nothing is.

The majority argues that the passive solicitation rule is based on content because it restricts a particular set of messages, namely requests for donations. But under this analysis

any regulation of solicitation would be a content-based restraint because such a rule would have to differentiate words that solicit from ordinary speech. The majority's analysis places it in tension, if not explicit conflict, with United States Supreme Court authority, which has held that solicitation restrictions may be content-neutral restraints. *See United States v. Kokinda*, 497 U.S. 720, 736 (1990) (plurality opinion) (upholding ban on in-person solicitations and calling "the inherent nature of solicitation itself, a content-neutral ground"); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 648-49 (1981) (stating that restriction on solicitation locations in public fairgrounds is content-neutral because it "applies evenhandedly to all who wish to . . . solicit funds"). Under the majority's analysis, however, the *Kokinda* and *Heffron* restrictions would be content-based restraints because they would, as the majority states, restrict individuals "from communicating a particular set of messages—requests for donations." The majority's analysis eliminating any possibility of a reasonable restraint on manner of solicitation is difficult to reconcile with Supreme Court precedent that has upheld such restrictions.

Our decision in *ACORN v. City of Phoenix*, 798 F.2d 1260 (9th Cir. 1986), also supports a holding that the passive solicitation rule is content-neutral. In *ACORN* we said that an ordinance prohibiting solicitation of vehicle occupants is content-neutral because it "does not single out any group or the content of any speech. The ordinance applies evenhandedly to every organization or individual, regardless of viewpoint, which would desire to solicit contributions, business, or employment from the occupants of vehicles traveling on Phoenix streets." *Id.* at 1267 (citing *Heffron*, 452 U.S. at 648-49). The majority distinguishes *ACORN* because it sees no indication that the ordinance in *ACORN* forbade asking drivers or passengers to contribute by mail, as opposed to contributing on the spot. However, the majority cites no language in *ACORN* indicating that the ordinance at issue prohibited only the immediate physical exchange of money. The

text of the ordinance states only that a person may not "solicit, or attempt to solicit, employment, business or contributions from the occupants of any vehicle." *Id.* at 1262.

The majority's reasoning for deciding that the City's passive solicitation rule is content-specific would have required a different result in *ACORN* because the ordinance in that case restricts people from "communicating a particular set of messages—requests for donations," while allowing the same individuals to approach stopped drivers and communicate other ideas. The majority does not claim to overrule *ACORN*, and thus in my view *ACORN* compels us to hold the City's passive solicitation rule content-neutral because it also applies evenhandedly to anyone who solicits by certain methods.

Rule F.3.a is constitutional because it is content-neutral, is narrowly tailored, and allows for ample alternative channels of communication. To hold otherwise, as does the majority, is in substance to say there cannot be a reasonable regulation of manner of solicitation, and in my view that position cannot be correct.

## IV

Finally, I address Rule G.4, the captive audience rule. I conclude that a close case is presented on this rule but that it should nonetheless be upheld because of the special nature of Seattle Center. The Supreme Court has stated that the government may "shield the public from some kinds of speech on the ground that they are more offensive than others" when a "degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975). We have overturned rules restricting speech near captive audiences when we have determined that the audience in question was not captive at all. *See Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 861 n.10 (9th Cir. 2004).[3] But until now we have never held that a captive

---

[3]In *Kuba* we did not, as the majority suggests, hold that all patrons of a place of public entertainment could not be a captive audience unless they

audience could never exist in a public park. The majority's blanket rule will preclude courts from addressing an audience's possible captive state on a fact-specific basis. Moreover, the majority's approach is singularly inappropriate when we consider the unique nature of Seattle Center, containing many outstanding venues for entertainment, theater, ballet, sports, and dining.

Seattle Center is an unusual public complex that contains many captive audiences who are observing or awaiting the major events that are presented at McCaw Hall, KeyArena, or the Bagley-Wright Theater, waiting in line for rides at the Fun Forest Amusement Park, or simply attending other Center attractions, including the popular Center House restaurant venues. Seattle Center also hosts special events such as Bite of Seattle, which in theory may be impacted if the majority treatment of the Rules at issue here is sustained. The very viability of Seattle Center, the ability of Seattle residents and tourists to take advantage of the unique opportunities showcased there, in my view is placed in danger if the City is not permitted fairly and effectively to regulate the conduct of all those who may interfere with Seattle Center events. The fair regulation of street performer speech does not entirely cancel the speech out, but rather subjects it to a regime that can coexist with Seattle Center's other activities in a way that does not unduly damage its commerce and value to the City.

The majority is correct that Seattle Center is a public forum, and this categorization affects our choice of precedents to apply. But there are important differences between Seattle Center and the typical open-air public park. Seattle Center is

were particularly vulnerable. Instead, we emphasized that the highly mobile individuals in *Kuba* were not "constricted" to a particular location while they walked towards a concert venue. *Kuba*, 387 F.3d at 861 n.10. Visitors to Seattle Center must keep their place in line in order to gain entry to limited-access buildings or events.

a unique urban center defined not solely by trees and open fields but also by museums, theaters, concert halls, amusement rides, and other special attractions for the City and its visitors. Visitors pay considerable sums to see these attractions, and they must often wait in line before attending. Unlike in a traditional public park, these patrons, should they be confronted by unwelcome or harassing performances, cannot just walk away to the next available shade tree. Rather, to avoid the nuisance these patrons must give up their place in line, potentially forfeiting their ability to enjoy the Seattle Center event they paid to attend. The City has a significant governmental interest in ensuring that these patrons have an enjoyable experience, so that Seattle Center and the City as a whole may continue to be a desirable and commercially profitable destination. See *Thomas*, 534 U.S. at 323 ("Regulations of the use of a public forum that ensure the safety and convenience of the people are not 'inconsistent with civil liberties but . . . [are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend." (quoting *Cox v. New Hampshire*, 312 U.S. at 574)).

The captive audience rule applies to "speech activities" rather than to only street performers. The majority imagines that the City will enforce the captive audience rule against those who make "the mildest remark." But, as Chief Judge Kozinski aptly explains in his dissent, there is no indication that the City has or ever will enforce this Rule in such a draconian manner. *See Washington State Grange v. Washington State Republican Party*, 128 S.Ct. 1184, 1190 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."). The majority relies on *Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574-75 (1987), to say that overbroad regulations are unconstitutional. But there the Supreme Court invalidated the ordinance after concluding that there was no feasible limiting construction. *Id.* at 575-76. However, the majority has engaged in no such

analysis of the captive audience rule, and therefore its over-breadth analysis is incomplete. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) ("Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged [rule].").[4]

It is unrealistic and unwise to expect patrons paying to visit an attraction to give up their right to access the attraction when confronted with unwelcome behavior. Before instituting the captive audience rule, the city received weekly complaints about street performers harassing individuals in a captive audience. The captive audience rule is a reasonable method of achieving the City's legitimate interest in the safety and convenience of Seattle Center patrons. It leaves open alternative channels of communication—in a designated location for street performers and anywhere away from a captive audience for everyone else. By contrast, the majority's incorrect analysis echoes its earlier errors by reading "place" and "manner" out of the general rule that allows reasonable time, place, and manner restrictions. I would hold that the captive audience rule is a reasonable restriction on speech.

---

[4]The majority claims that any bias in favor of commercial over noncommercial speech is by itself cause to invalidate a regulation. However, the majority's precedential support is limited to regulations on signs or billboards. *E.g.*, *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1081 (9th Cir. 2006) ("[A]n ordinance is invalid if it imposes greater restrictions on noncommercial than on commercial billboards or regulates noncommercial billboards based on their content." (quotation omitted)). The majority's analysis on this point proceeds from the fact that although the captive audience rule applies to "both political speech and commercial speech," it does not apply to "licensed concessionaires," such as food and drink vendors. Licensed concessionaires, however, are subject to a myriad of other restrictions not applicable to noncommercial speakers. Moreover, Seattle Center patrons waiting in line might welcome an opportunity to purchase food or drink.

# V

Accordingly, I would reverse the district court's rejection of the permit and badge requirements for the reasons aptly stated by Chief Judge Kozinski in his dissent, and also would reverse the district court's decisions declaring unconstitutional Rule F.5, Rule F.3.a, and Rule G.4, respectively governing performance locations, passive solicitation, and captive audiences. The latter three Rules are reasonable time, place, and manner restrictions that allow for ample alternative channels of communication. They are justified by the City's legitimate interest in protecting the safety and desirability of Seattle Center as a major tourist draw and a wholesome venue for Seattle's citizens, and if the Rules are followed they do not pose a significant threat to the exchange of speech and ideas. Although I recognize a significant value to speech in street performance, the majority's elimination of the City's permit scheme and the other regulatory rules adds only a negligible marginal speech value, and this at the cost of public order. The stakes for the City of Seattle in maintaining order at Seattle Center are high, because this is a prerequisite to the full enjoyment of Seattle Center by Seattle's residents and visitors who together make up the millions of annual users of Seattle Center. I respectfully dissent from the majority's invalidation of the permit requirement and Rules governing passive solicitation and presentation near captive audiences, and from the majority's remand on the Rule governing location of performance.

---

N.R. SMITH, Circuit Judge, concurring in part and dissenting in part, with whom Chief Judge KOZINSKI joins in Parts III and IV, with the exception of the first and last paragraphs of Part IV:

Because our precedent forces me to treat the Seattle Center as a traditional public forum, I agree that the City of Seattle's

permitting requirements and ban on active solicitation for street performers at the Seattle Center are facially unconstitutional. I also agree with the majority's invalidation of the City's captive audience rule. However, the City's performance location rule is constitutionally valid. Therefore, I join Parts I, II, III, V, and VI of the majority opinion.

I write separately, because (1) the characterization of the Seattle Center as a public forum is essential to this decision; (2) although the permitting scheme is not narrowly tailored, it relates to and meaningfully promotes the City's legitimate interests; (3) the City has met its burden to show that the performance location rule is a constitutionally reasonable time, place, and manner restriction; and (4) while the City's active solicitation rule is not content-neutral, the majority's analysis seems to hold that any restriction on solicitation is necessarily content-based.

# I

We are constrained to view the City's rules regulating speech in the Seattle Center through the lens of the Supreme Court's forum analysis. *See Greer v. Spock*, 424 U.S. 828, 836 (1976) (adopting a forum analysis as a means of determining whether the government's interest in limiting use of its property outweighs the interest of others wishing to use the property for other purposes). Our conclusion as to the nature of the forum in which the regulations apply not only informs our analysis but largely shapes the outcome, "because the extent to which the Government may limit [speech] depends on whether the forum is public or nonpublic." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). Therefore, the disposition of this case hinges almost entirely on whether we characterize the Seattle Center as a traditional public forum.

The majority states, without much analysis, that the record supports characterizing the Seattle Center as a traditional pub-

lic forum. I agree. However, given the significance of the majority's holding and the fact that the majority strikes down most of the City's challenged rules as facially unconstitutional, we should not fail to fully consider the nature of the forum at the Seattle Center.

There is no contention that the Seattle Center is a nonpublic forum.[1] The record plainly shows that the Center is publicly owned, free and open to the public, and available as a forum for public communication. Yet a determination of the precise type of public forum is still necessary to guide our analysis.

If, as the City argued before the district court, the Seattle Center is a "limited public forum," our review is somewhat lenient. A limited public forum is considered "a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics." *Cogswell v. City of Seattle*, 347 F.3d 809, 814 (9th Cir. 2003) (citations and internal quotation marks omitted). Under this analysis, the City's regulations would be upheld "as long as (1) the restriction does not discriminate according to the viewpoint of the speaker, and (2) the restriction is reasonable." *Id.* at 814 (citations omitted). Nothing in the record indicates that the City has limited the use of the Seattle Center to certain groups or dedicated it solely to the discussion of certain subjects. Further, the record suggests that the Seattle Center has historically been a public forum. Therefore, the Center is not a limited public forum.

If the Seattle Center is a traditional public forum, "the government may not prohibit all communicative activity" and, to

---

[1]A nonpublic forum is a place that does not, by tradition or designation, serve as a forum for public communication; thus, content-based restrictions in nonpublic fora need only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

enforce any content-based exclusion, the state "must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *See Perry Educ. Ass'n*, 460 U.S. at 45 (citing *Carey v. Brown*, 447 U.S. 455, 461 (1980)). Reasonable time, place, and manner restrictions can be imposed if they are "content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* (citations omitted).[2] Quintessential public fora include "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Id.* (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).

To determine whether a venue is a traditional public forum, courts have considered a number of factors, including (1) the compatibility of the dedicated uses of the forum with expressive activity; (2) whether a speaker has a reasonable expectation that their speech will be protected in the forum; (3) the historic use of the forum; (4) the current use of the forum; (5) whether the public has had free access to the forum; (6) whether the forum is a public thoroughfare; (7) the value of the area as an expressive locale; (8) the government's interest in commercial revenues; (9) any purpose for which the land may have been dedicated and the consistency of that use with free speech. *See ACLU of Nevada v. City of Las Vegas* (*ACLU*

---

[2]If the Seattle Center were a "designated public forum," our analysis would be the same, because the Center continues to be open to the public. Public property, that is not traditionally a public forum, may nonetheless be "opened for use by the public as a place for expressive activity." *Perry Educ. Ass'n*, 460 U.S. at 45. In such a "designated public forum," while the state is "not required to indefinitely retain the open character of the [forum], as long as it does, it is bound by the same standards as apply in a traditional public forum." *Id.* at 46. A designated public forum includes "a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Id.* (citing *Cornelius*, 473 U.S. at 802).

*I*), 333 F.3d 1092, 1100 & n.7 (9th Cir. 2003) (citations omitted) (collecting cases describing factors that courts have applied to determine the nature of the forum).

Our case law emphasizes three factors in determining the nature of the forum: "1) the actual use and purposes of the property, particularly status as a public thoroughfare and availability of free public access to the area . . . ; 2) the area's physical characteristics, including its location and the existence of clear boundaries delimiting the area . . . ; and 3) traditional or historic use of both the property in question and other similar properties. . . ." *Id.* at 1100-01 (citations omitted).

A reasonable application of these factors to the facts in this record confirms the majority's characterization of the Seattle Center as a traditional public forum. The record shows that the Center is free and open to the public. It is a gathering place for cultural and political rallies. It hosts formal events, including concerts, plays, ballets, athletic events, and other cultural activities. It is a forum for countless informal gatherings every day as thousands of people frequent the Center to "congregate on the sidewalks and parks that are open to the public." With more than ten million visitors a year, the current use and purpose of the facility is unavoidably public. The Center's own literature characterize the Seattle Center as "one of the nation's most extraordinary urban parks and entertainment centers . . . . a social and cultural gathering place for people around the world . . . . [a] host to remarkable arts, cultural, educational and community programs and international festivals . . . . [and] a gathering place and public space open to everyone [and] reflective of the Northwest's diversity and alive with innovation . . . ."

The Center's physical characteristics and location also support the conclusion that the Center is a traditional public forum. It is publicly owned and centrally located in the heart of Seattle. Of the eighty-seven acres, twenty-three are open

spaces and plazas with numerous walkways and access points to the downtown area and surrounding neighborhoods.

Further, the traditional and historic uses of the land also supports its designation as a traditional public forum. When the land was dedicated to the City over one hundred years ago, it was dedicated for "the use of the public forever." Nearly fifty years ago, the Seattle Center was home to the 1962 World's Fair, and it has continued to welcome the public ever since.

I also note that, given the express purpose of the Seattle Center, the forum is also clearly compatible with expressive activity. Based on the Center's mission and history as a gathering place for cultural, social, political, and artistic expression, patrons of the Center could reasonably expect that their speech would be protected. The Center is also clearly a pedestrian thoroughfare for the ten million people who visit the center each year, and the Center has obvious value as an expressive locale. While the City no doubt has an interest in commercial revenues, the City's interests and the stated purposes of the Center are not inconsistent with free speech.

I acknowledge that the Seattle Center is not the average public park. It is a dynamic and complex evolution of public space, ripe with modern innovation and offering the public a wealth of educational, social, cultural, and commercial opportunity. The City's challenge is to balance the competing uses and manage the Center in a way that fosters mutual enjoyment of these multiple uses. This is no small task. Yet, regardless of the novel attributes of Seattle's "most extraordinary urban park," the Seattle Center remains a traditional public forum and the City's regulation of speech "is subject to the highest scrutiny." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee* (*Lee*), 505 U.S. 672, 678 (1992).

## II

The City's permitting scheme is not a valid time, place, or manner regulation, because it "burden[s] substantially more

speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). The City's goal is to promote the safety and convenience of the public by regulating the conduct and location of those who (1) regularly attract crowds when performing in the Seattle Center and (2) who are overly aggressive, abusive, or harassing when soliciting donations from those who pass by. The City's interest is both significant and legitimate. Yet, the broad brush of the permit requirement, on its face, sweeps within its prohibition not only the problematic aggressive behavior of regular street performers, but also any spontaneous or informal artistic expression by anyone. "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799-800 (citing *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)). For those wishing to comply with the law, the prior restraint of the permit requirement would inevitably result in delays, deterring and effectively banning a significant amount of protected expression. *See Grossman v. City of Portland,* 33 F.3d 1200, 1206 (9th Cir. 1994) (the delay caused by complying with a permitting procedure prevents immediate response to immediate issues and can deter or even preclude immediate responses to late-breaking events) (citations omitted). Because the rule would burden all artistic expression and reach substantially more individuals than the few problem street performers, it is not narrowly tailored. *See Frisby*, 487 U.S. at 485.

Additionally, while a permitting scheme might be justified for large groups, there is nothing to suggest that the City's interest is sufficient to justify the prior restraint of a single-performer in this public forum. *See Grossman*, 33 F.3d at 1206 (permit requirement was unconstitutional where it could apply to "the actions of single protestors"); *Rosen v. Port of Portland*, 641 F.2d 1243, 1247-48 (9th Cir. 1981) (same). Because (1) prior restraints are disfavored and (2) this prior restraint is targeted at individual speakers, the permit requirement must be found unconstitutional, if the state could

achieve its purported goals in a less restrictive manner. Even if the permit requirement were more efficient in preventing the evils associated with the street performers, punishment of actual wrongdoers could achieve the City's interests without burdening all forms of artistic expression with the prior restraint. *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (enforcement of antifraud laws sufficient to protect citizens from possible fraud resulting from fundraising solicitations). As the majority illustrates, there are also alternative means of coordinating multiple uses of the Seattle Center, such as reasonable time and place restrictions, without requiring permits for all artistic expression.

With regard to the permitting scheme, I disagree with the majority's characterization that the permitting requirements do not promote the government's interests "in any meaningful way." The majority states that "[t]here is . . . no reason two street performers with permits would be less likely to engage in a territorial dispute than two street performers without permits." The majority also states that the permit requirement "bears no apparent connection to the City's stated interest in reducing hostile performer behavior. . . . [because] there is no reason why a performer with a permit is likely to be less hostile than one without a permit." This analysis fails to view the permit requirement in the context of the entire permitting scheme. Contrary to the majority's reasoning, the permitting system advances the City's interest, because performers (who violate the Seattle Center rules) risk temporarily losing their permit and, thus, their ability to perform. If a performer engages in a territorial dispute (ostensibly because he does not abide by the first come, first serve rules regarding the designated performance locations), he might also lose his permit. Likewise, a performer who engages in hostile behavior towards other performers or patrons likewise risks losing his permit. The potential to lose the right to perform is a substantial, common sense deterrence to the undesirable conduct the City seeks to regulate.

Further, I disagree with the majority that the permitting requirements do not aid in coordinating multiple uses of the Seattle Center. While the permit system does not limit the total number of permits, nor assign particular performers to specific locations at specific times, it does provide an orderly means for allocating and prioritizing the use of performance locations among competing uses. That is, permitted performers have priority to use the performance locations over non-permitted performers. Further, the permitting scheme allocates the use of particular spaces among permittees on a first come, first served basis. A permitted street performer is protected if he abides by the rules, and he stands to temporarily lose his permit (and right to perform) if he does not. While there may be other schemes that might better clarify or coordinate the use of the Seattle Center for street performances, the majority's conclusion that the permit rule does not promote or have any connection to the City's interest ignores the punitive and deterrent elements of the permitting scheme. Although I agree that the permitting scheme is not narrowly tailored nor is the City's interest significant enough to justify such a prior restraint on individual speakers, the scheme otherwise relates to and would meaningfully advance the City's interest.

## III

I dissent with regard to the City's performance location rule. Drawing all reasonable inferences in favor of the City, *see Anderson*, 477 U.S. at 255, I agree that the City has met its burden with unrebutted evidence that demonstrates a significant, legitimate interest, which "would be achieved less effectively absent the regulation." *See Ward*, 491 U.S. at 799 (citation omitted). With regard to whether the rule allows for ample alternative channels for communication, I disagree with the majority, which concludes that Berger's declaration presents "conflicting evidence concerning whether the sixteen dedicated locations provide adequate access to the intended audience." Majority Op. at 7774.

In imposing time, place and manner restrictions, the government must only "refrain from denying a '*reasonable opportunity*' for communication." *Menotti v. City of Seattle*, 409 F.3d 1113, 1141 (9th Cir. 2005) (emphasis added) (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986)). The Supreme Court has instructed that reasonable time, place, and manner restrictions need not preserve the most effective means of communication; rather, such restrictions must only guarantee that individuals retain the "ability to communicate effectively." *Id.* at 1138 n.48 (citing *City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984); *Hill v. Colorado*, 530 U.S. 703, 729, (2000) (upholding a law that prohibited individuals from having a position that maximized accessibility to the target of their speech)).

In *Menotti*, we held that a city order prohibiting protest demonstrations in certain areas during a World Trade Organization ("WTO") meeting left open ample alternative channels of communication. *See id.* at 1138-43. The city order effectively prevented protestors from delivering their message directly to WTO delegates in the facilities where the WTO meetings were held. *Id.* at 1138. Instead, protestors were relegated to areas directly across the street from the meeting location, as well as throughout the rest of downtown Seattle. *Id.* In concluding that the city order provided ample alternative means of communication, we noted that "[t]he Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting." *Id.* at 1138 (citations omitted). "A time, place, and manner restriction does not violate the First Amendment 'simply because there is some imaginable alternative that might be less burdensome on speech.' " *Id.* (citing *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Further, we recognized that "the First Amendment does not guarantee the right to communicate one's views at all times and places

or in any manner that may be desired." *Id.* (citations omitted). "The 'ample alternatives' cannot be taken to mean that each protestor has the right to convey his or her message in the manner preferred by that protestor." *Id.* at 1140. The order afforded protestors a reasonable opportunity to communicate, because "[t]he protestors could reasonably expect their protest to be visible and audible to delegates, even if not as proximate as the protestors might have liked." *Id.* at 1138.

Berger's declaration asserts only that "many [of the locations] are far off the walkways where it is very difficult to notice the performer."[3] Giving Berger's assertion the benefit of very generous inferences, we might conclude that some of the City's designated performance locations are less favorable to Berger, because he would not be as close to his audience as he would like. However, the First Amendment does not guarantee Berger the right to convey his message in the most effective manner, in the manner he prefers, or as close to his audience as he might like. *See id.* at 1138-40.

Further, Berger's conclusory expression of opinion does not create any material dispute of fact that would foreclose summary judgment in favor of the City. For instance, Burger's declaration does not dispute the location of the designated performance areas as portrayed by the City's evidence. Berger's declaration also does nothing to negate the other facts evident from the record. For instance, the record confirms that the location rule does not exclude performers from the Seattle Center, but limits access to sixteen locations within the forum. The record also shows that some ten million people visit the Space Needle, Key Arena, Pacific Science Cen-

---

[3]The majority also cites Berger's assertion that construction equipment at the Seattle Center temporarily blocked access to certain of the designated performance locations. This assertion is inapposite to the facial validity of the performance location rule. Further, even if construction impeded the use some performance locations for "weeks on end," such a temporary condition cannot be relevant to determining whether the rule provides reasonable opportunity to communicate.

ter, and the Experience Music Project each year. The map showing the performance locations places the street performers in areas that are plainly accessible to the corridors of traffic and very near places where the public would naturally congregate as they visit the City's famous attractions. The record shows that the performance locations were selected as a result of a public process in which the street performers themselves provided significant input. These sixteen locations provide more than reasonable opportunity to communicate to the five to eight performers who typically perform on the Seattle Center grounds at peak times. Further, if the performance locations prove inadequate for a particular performance, a performer can request special approval for an alternate performance location.

Based on Berger's assertion that "many" of the locations are "far off the walkways," the majority concludes, that "there are conflicting inferences to be drawn regarding material facts pertinent to the dispositive consideration, adequacy of access to the intended audience." Majority Op. 7774. By inference, the majority suggests that the location rule must guarantee a level of access that meets the speaker's subjective expectation, something that our cases have not previously required. In answering whether Berger and other street performers have an objectively reasonable opportunity to communicate, the record shows that the performance locations are all (1) within the Seattle Center, (2) adjacent to pedestrian walkways, and (3) near the Center's most popular attractions. On this basis, the street performers can reasonably expect that their performances will be "visible and audible to [their intended audiences], even if not as proximate as [they] might have liked." *See Menotti,* 409 F.3d at 1138. Berger's assertion is, at most, an expression of his subjective view that the designated locations prevent the most effective form of communication. It does not create conflicting evidence as to whether the performance locations objectively provide "reasonable opportunity for communication." *Id.* at 1141. Therefore, I would hold that the record is sufficiently developed, and the City has met its

burden to show that street performers have ample, reasonable alternatives for communication.

## IV

I join in the majority's conclusion that the active solicitation ban is unconstitutional as presently written. Yet, I am concerned that the majority opinion could be read to hold that any restriction on solicitation is necessarily content-based and therefore subject to strict scrutiny.

I agree that solicitation falls within the protection of the First Amendment. *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 628-32 (1980).[4] Contrary to the majority's assertion, however, First Amendment jurisprudence generally treats regulation of solicitation as content-neutral. The Supreme Court has characterized "the inherent nature of solicitation itself, a content-neutral ground." *United States v. Kokinda*, 497 U.S. 720, 736 (1990). Likewise, in *Heffron v. International Society for Krishna Consciousness,*

---

[4]I note that *charitable* solicitation has been held to receive the full protections of the First Amendment. "[C]haritable solicitations 'involve a variety of speech interests . . . that are within the protection of the First Amendment,' and therefore have not been dealt with as 'purely commercial speech.' " *Riley*, 487 U.S. at 788 (quoting *Schaumburg*, 444 U.S. at 632). *Non-charitable* solicitation may not be entitled to the same measure of protection as charitable solicitation. *See id.* at 796. If such solicitation is motivated purely by profit and follows a provision of goods or services, it may be more akin to commercial speech, and not fully protected expression. There has been no argument that the solicitation rule in this case regulates only commercial speech. And it is clear that the regulation applies to both charitable and non-charitable solicitation by street performers. Therefore, the majority correctly applies the test for fully protected expression. Nonetheless, it seems likely that the street performers targeted by the City's regulations perform with an expectation of receiving remuneration. Although the record is not clear, I suspect that most of the street performers are in the business of entertainment and provide entertainment services and accept "contributions" and "donations" as a source of personal income. For them, their craft is their ware and their solicitation is inevitably commercial in nature.

Inc., 452 U.S. 640, 648-49 (1981), the Court found a regulation limiting solicitation in a public fairground to certain locations to be content-neutral, because it applied to all who sought to solicit funds.

Our own case law confirms that solicitation regulations can be content-neutral. *See ACORN v. City of Phoenix*, 798 F.2d 1260 (9th Cir. 1986). In *ACORN*, the solicitation ordinance in question prohibited solicitation of vehicles while they were stopped in traffic. *Id.* at 1267-68. The ordinance provided: "No person shall stand on a street or highway and solicit, or attempt to solicit, employment, business or contributions from the occupants of any vehicle." *Id.* at 1262 (quoting Phoenix City Ordinance § 36-101.01). The ordinance did not ban solicitation of contributions altogether, but only regulated the location and permissible targets for such activity. *Id.* at 1267. The ordinance also permitted other forms of communication (e.g. oral advocacy and distribution of literature). *Id.* We concluded that the ordinance was content-neutral, because it did "not single out any group or the content of any speech." *Id.* We further explained that the ordinance was not passed to suppress any particular viewpoint but "was adopted to promote the city's interest in 'public peace, health and safety.' " *Id.* at 1267-68.

The majority relies on our decision in *ACLU of Nevada v. City of Las Vegas* (*ACLU II*), 466 F.3d 784 (9th Cir. 2006), for the proposition that a regulation banning conduct associated with solicitation is content-neutral, while a regulation regulating the speech associated with solicitation is not. In *ACLU II*, we considered whether an ordinance banning solicitation at certain Las Vegas locations was content-neutral. The ordinance prohibited any solicitation, defined as " 'to ask, beg, solicit or plead, whether orally, or in a written or printed manner, for the purpose of obtaining money, charity, business or patronage, or gifts or items of value for oneself or another person or organization.' " *ACLU II*, 466 F.3d at 788 (quoting Las Vegas Municipal Code § 10.44.010(A)). The ordinance

was interpreted to prohibit the distribution of handbills or leaflets that solicit money or donations, regardless of whether they involved a request for immediate or future donations. *Id.*

The three-judge panel concluded that the ordinance was not content-neutral because, "in order to enforce the regulation, an official 'must necessarily examine the content of the message that is conveyed.' " *Id.* at 794 (quoting *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992)). In other words, because law enforcement would have to read the content of the message conveyed to determine whether it fell within the ban, the ordinance was content-based. *See id.* at 794 & 796. The three-judge panel distinguished *ACORN* and prior Supreme Court cases, which had previously held solicitation regulations to be content-neutral, by characterizing those cases as involving regulations of the "act of solicitation" and not "words of solicitation." *Id.* In essence, the panel held that solicitation regulations can be content-neutral only if they regulate "an element of conduct interwoven with otherwise expressive solicitation." *Id.* at 795 (quoting *Lee*, 505 U.S. at 705 (Kennedy, J., concurring)). But, if the regulation restricts only the speech associated with the solicitation, it is content-based and therefore violates the First Amendment unless it survives strict scrutiny. *See id.*

The distinction, made in *ACLU II* between an "act of solicitation" and "words of solicitation," would not make any difference under the majority's content-neutrality analysis. Based on *ACLU II*, the majority distinguishes the outcome in *ACORN*, reasoning that the regulation there prohibited only an act of solicitation: the immediate physical exchange of money.[5] Therefore, under the majority's reasoning, a ban on

---

[5]While the majority interprets the ordinance at issue in *ACORN* as prohibiting "only the immediate physical exchange of money," I disagree. I read the ordinance as clearly applying to any solicitation of or "attempt to solicit employment, business or contributions" regardless of whether money was physically exchanged. *See ACORN*, 798 F.2d at 1262.

in-hand solicitation involving the physical exchange of money would be content-neutral. But applying the logic of *ACLU II* to the facts of *ACORN*, the distinction fails to reconcile the different outcomes.

As a practical matter, there can be no act of solicitation without words of solicitation. That is, all solicitation involves expressive speech or conduct. A solicitation is nothing more than a request in which the solicitor communicates, in some fashion, his desire that the person solicited do something, such as give money, join an organization, transact business, etc.[6] If there is no such expression, it cannot be said that any act of solicitation has occurred. Therefore, whether the regulation restricts conduct or speech, the applicability of the regulation depends on an evaluation of the content of the speech associated with the conduct.

For example, to determine whether an exchange of money is the result of a solicitation or a voluntary gesture of gratitude between old friends, there must necessarily be an evaluation of both conduct (the in-hand exchange of money) and the expressive communication associated with it. What did the recipient of the money communicate that led to the exchange? If he asked for money, then the regulation applies. If he merely expressed gratitude for his old friend and the donor volunteered the money, the regulation does not apply. Under the majority's reasoning, no regulation that applies to an "act of solicitation" can ever be content-neutral, because conduct only becomes an act of solicitation when it is associated with words of solicitation. And to find words of solicitation, there must necessarily be some evaluation of the content of the communication associated with the conduct.

---

[6]A common dictionary defines "solicit" as "to approach with a request or a plea (as in selling or begging) . . . to endeavor to obtain by asking or pleading . . . ." Webster's Third New International Dictionary 2169 (1993).

Under the majority's reasoning, the ordinance in *ACORN* should have been held to be content-based, because to determine its applicability, law enforcement was required to evaluate the content of communications to determine whether individuals standing alongside stopped vehicles were asking the occupants for money, as opposed to simply communicating their views on political issues. Therefore, either *ACORN* or *ACLU II* was wrongly decided. Given the broad treatment of general solicitation regulations as content-neutral, I suggest the latter. In my view, *ACLU II* took the term "content-based" to its literal extreme and employed a hyper-technical analysis that effectively precludes any reasonable time, place, or manner restrictions on solicitation. Consequently, I find the majority's reliance on *ACLU II* to be misplaced.

The mere fact that a regulation requires an evaluation of the content of a communication is not determinative as to whether the regulation, on its face, is an impermissible content-based regulation. *See Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dept.*, 533 F.3d 780, 789 n.5 (9th Cir. 2008). Any regulation of solicitation necessarily requires an evaluation of the communication to determine whether it falls within the regulation. But such an evaluation is not necessarily dependent on the substantive content of the message. It turns, instead, on the general character or form of the communication or the type or class of speech involved.

*In Hill v. Colorado,* 530 U.S. 703, 722 (2000), the Supreme Court upheld a Colorado statute banning any leafletting, displaying of signs, engaging in oral protest, education, or counseling within eight feet of any person within a radius of one-hundred feet of a health care facility.[7] The Court considered

---

[7]In *Hill*, the challenged statute provided, "No person shall knowingly approach another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet from any entrance door to a health care facility. . . ." *Hill*, 530 U.S. at 708 (citing Colo. Rev. Stat. § 18-9-122).

whether such a proscription was content-neutral, because enforcement of the statute required an examination of the oral statements made by a person suspected of violating the statute. *Id.* at 720. In holding the statute to be content-neutral, the Court noted:

> It is common in the law to examine the content of a communication to determine the speaker's purpose. Whether a particular statement constitutes a threat, blackmail, an agreement to fix prices, a copyright violation, a public offering of securities, or an offer to sell goods often depends on the precise content of the statement. We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct.

*Hill*, 530 U.S. at 721. The Court reasoned that even if a "cursory examination" were required to determine whether the statute applied, such an examination would not be problematic. *See id.* at 721-22.

First Amendment case law demonstrates that we afford varying degrees of protection to different *types* of speech. Political speech, for example, is at the core of First Amendment protection and any restrictions placed upon it must weather an exacting, strict scrutiny. *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (citing *Roth v. United States*, 354 U.S. 476, 484 (1957)); *ACLU of Nevada v. Heller*, 378 F.3d 979, 988 (9th Cir. 2004). In contrast, purely commercial speech has been afforded a more "limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). Presumably, a regulation that applies only to commercial speech requires an evaluation of the content of the speech to determine the character or type of speech (whether it is commercial). Yet, this type of evaluation has not generally been

held to be content-based and does not trigger strict scrutiny review. In the same way, an evaluation of a particular communication to determine whether it is a solicitation is not based on the substantive content of the message or the viewpoint of the speaker. It is, instead, a cursory evaluation to determine the general character or form of the speech itself. This evaluation of form does not make the regulation content-based.

Further, in the abstract, a simple solicitation of funds does not necessarily involve the exposition of any ideas. As the Supreme Court has stated, charitable solicitation falls within the greater protection of the First Amendment, because it "is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues." *Schaumburg*, 444 U.S. at 632. "[C]haritable appeals for funds . . . involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Id.* Consequently, the substantive content of a solicitation triggering constitutional protection is not the mere request for funds, but the viewpoints, ideas and persuasive speech that are intertwined and communicated with the solicitation. A regulation that asks only whether the communication is a solicitation of any kind does not require an evaluation of any substantive content. Therefore, the type of evaluation required by a typical solicitation regulation (i.e. whether the communication is a solicitation) is not the type of content-based evaluation that the First Amendment disfavors.

In my view, a solicitation regulation is content-neutral if (1) the underlying purpose of the regulation is not to suppress a particular viewpoint or any substantive idea;[8] (2) the regula-

---

[8]*See Ward*, 491 U.S. at 791 (stating that the government's purpose in adopting the regulation is the primary consideration).

tion, on its face, does not single out particular substantive content for differential treatment;[9] and (3) the regulation does not single out a particular group.[10] In other words, if a solicitation rule applies even-handedly to anyone who solicits, it is content-neutral. *See Heffron*, 452 U.S. at 648-49.

However, I join the majority in invalidating the City's active solicitation ban, because this particular regulation does more than generally ban solicitation or regulate only the manner of solicitation. It singles out a particular group that is defined, in part, by the medium through which they express themselves and the substantive message they convey. It also requires more than a technical evaluation of the general character of the communication. To enforce the ban, an official must first determine whether the communication was a solicitation (which would be a permissible content-neutral evaluation). The official must then determine whether the solicitation was active or passive (also a content-neutral evaluation). If the speech is an active solicitation, then the rule requires the official to (1) determine who made the solicitation and whether that person is a street performer, and (2) evaluate whether the active solicitation was made in connection with the street performer's artistic expression or performance (as opposed to soliciting funds for some other cause). As written, the rule targets only those involved in artistic expression. In my view, it improperly focuses on who is doing the soliciting and for what purpose they are soliciting, converting the rule into an impermissible content-based regulation.

---

[9]*See Foti v. City of Menlo Park*, 146 F.3d 629, 636 n.7 (9th Cir. 1998).

[10]*See ACORN*, 798 F.2d at 1267 (a restriction on solicitation that "does not single out any group or the content of any speech" is content-neutral).